**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

PUBLISH

**FEB 14 2000**

**UNITED STATES COURT OF APPEALS**

**PATRICK FISHER**
**Clerk**

**TENTH CIRCUIT**

_____

BRIAN WILLIAMS; BRUCE
BRAUER,

      Plaintiffs-Appellees,

v.

WALTER F. IMHOFF; GARY J.
WILSON; RICHARD T. HUEBNER;
GEORGE A. JOHNSON, Trustees and
Committee Members of the Hanifen,
Imhoff, Inc. Profit Sharing Plan and
Trust,

      Defendants-Appellants.

No. 98-1448

_____

JEFFREY WALL; PAMELA
HIGGINS, PAMELA McCUSKEY,

      Plaintiffs-Appellees,

v.

WALTER F. IMHOFF; GARY J.
WILSON; RICHARD T. HUEBNER,

      Defendants-Appellants.

No. 98-1449

_____

STEVEN E. LEATHERMAN,

    Plaintiff-Appellee,

v.

WALTER F. IMHOFF; GARY J. WILSON; RICHARD T. HUEBNER,

    Defendants-Appellants.
_____

RUSSELL JANSKY,

    Plaintiff-Appellee,

v.

GARY J. WILSON; WALTER F. IMHOFF; RICHARD T. HUEBNER,

    Defendants-Appellants.
_____

GENE R. ANDRIST,

    Plaintiff-Appellee,

v.

GARY J. WILSON; WALTER F. IMHOFF; RICHARD T. HUEBNER,

    Defendants-Appellants.

No. 98-1450

No. 98-1454

No. 98-1456

APPEALS FROM UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. Nos. 98-M-511, 98-M-659,
98-M-1396, 98-M-593, 98-M-955)

2

Daniel S. Hoffman (Barbara Z. Blumenthal and Tobin D. Kern with him on the brief), of McKenna & Cuneo, L.L.P., Denver, Colorado, for the appellants.

John F. Walsh (Gary J. Ceriani, Charles W. Bess, and Margaret E. Peper, of Davis & Ceriani, P.C.; Robert F. Hill and Karen A. Tomb, of Hill & Robbins, P.C.; and Gary C. Davenport and Krista L. Tushar, of McGloin Davenport Severson & Snow P.C., on the brief), Denver, Colorado, for the appellees.

Before **BRISCOE** and **PORFILIO,** Circuit Judges, and **ROGERS,** Senior District Judge. [1]

**BRISCOE**, Circuit Judge.

Defendants Walter F. Imhoff, Gary J. Wilson, Richard T. Huebner, and George A. Johnson appeal from the district court's partial denial of their motion to compel arbitration and stay proceedings. At issue is the arbitrability of claims asserted under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001-1461, by plaintiffs, former securities exchange employees who were terminated from their employment by defendants and who allegedly did not receive proper valuation for stock held in their former employer's profit sharing plan. We exercise jurisdiction pursuant to 28 U.S.C. § 1291, and reverse and remand with directions to stay the proceedings and compel arbitration.

---

[1] The Honorable Richard D. Rogers, Senior United States District Judge for the District of Kansas, sitting by designation.

3

I.

Plaintiffs Brian Williams, Bruce Brauer, Jeffrey Wall, Pamela Higgins, Pamela McCuskey, Steven Leatherman, Russell Jansky, and Gene Andrist are all former employees of Hanifen, Imhoff, Inc. (HII), a corporation engaged in the securities business and a member of the National Association of Securities Dealers, Inc. (NASD). Prior to beginning their employment with HII, each plaintiff signed a Uniform Application for Securities Industry Registration or Transfer ("Form U-4"), which provided in pertinent part:

> I agree to arbitrate any dispute, claim or controversy that may arise between me and my firm, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of the [NASD] as may be amended from time to time and that any arbitration award rendered against me may be entered as a judgement in any court of competent jurisdiction.

App. at 100 (item 5).

At all times relevant to this case, HII had in place an employee stock-ownership program (ESOP) and a Profit Sharing Plan and Trust (the Hanifen Plan) that provided pension benefits. During their respective periods of employment with HII, plaintiffs were allegedly encouraged to, and in fact did, accumulate significant amounts of company stock through both the ESOP and the Hanifen Plan. Plaintiffs assert the Hanifen Plan was a "qualified trust" that enjoyed favorable tax treatment under the Internal Revenue Code. Plaintiffs further allege the Hanifen Plan constituted an "employee benefit plan" for

4

purposes of ERISA. See 29 U.S.C. § 1003(a). Finally, plaintiffs allege that defendants Imhoff and Wilson, who served as trustees of the Hanifen Plan, and defendant Johnson, who served as a committee member of the Hanifen Plan, were, for purposes of ERISA, fiduciaries with respect to the Hanifen Plan and its participants.

In 1994, HII was reorganized and Hanifen Imhoff Holdings, Inc. (Holdings) was created. Plaintiffs, who had previously worked in one of several HII divisions, became employees of one of three Holdings' subsidiaries. Notwithstanding the reorganization, plaintiffs apparently continued to purchase stock (now Holdings stock) through the ESOP program and the Hanifen Plan (which, after the reorganization, was open to all employees of Holdings and its subsidiaries).

Article IV of Holdings' articles of incorporation restricted ownership of company stock to "persons actively engaged in the business of the Corporation or any of its subsidiaries," and required any holder of company stock to sell his or her shares back to Holdings in the event that he or she ceased to work for Holdings or its subsidiaries. App. at 15. In a confidential private placement memorandum issued on September 15, 1994, Holdings indicated it would, in the event an officer or employee was terminated, purchase any company stock held by that officer or employee "at Adjusted Net Book Value." Id. at 15. The

5

memorandum further indicated that "Adjusted Net Book Value has historically reflected the fair market value of the shares of Hanifen common stock (i.e., the price at which a third-party purchaser might value the shares if the shares could be sold without restriction)." Id. at 16. Holdings' articles of incorporation also provided that the sale and disposition of stock by and through the Hanifen Plan would "be governed by the provisions of the Plan." Id. at 16. Under the provisions of the Hanifen Plan, stock value was to "be determined at [its] fair market value, as determined in good faith by the Committee and the Trustee." Id.

In the fall of 1995, defendant Huebner, who was a director and shareholder of Holdings, allegedly directed plaintiff Leatherman to contact Fiserv Clearing, Inc. (Fiserv), a large publicly-owned financial services firm, to inquire if it was interested in acquiring Holdings. During the period of negotiations with Fiserv, the defendants, all of whom were directors, officers, and/or shareholders of Holdings, placed a moratorium on the buying and selling of Holdings stock.

Plaintiffs assert that in early 1996, Fiserv made an offer of approximately $69 per share for the outstanding stock of Holdings and its subsidiaries, which was "equal to approximately three and a half times the 'Adjusted Net Book Value' of Holdings' stock." Id. at 18. Defendants "rejected the acquisition offer based upon an alleged problem with the terms and conditions of the offer." Id. According to plaintiffs, defendants then "embarked on a conspiracy to force a

6

significant percentage of minority shareholders, who were also employed by Holdings, out of Holdings by terminating their employment." Id. More specifically, plaintiffs contend they were terminated and forced to sell their shares of Holdings stock back to Holdings at "Adjusted Net Book Value," which "was substantially lower than the fair market value as evidenced by Fiserv's [1996] offer." Id. On December 31, 1997, after completing the force-out of minority shareholders, defendants allegedly agreed to sell Holdings to Fiserv. The purchase price paid by Fiserv was substantially similar to its initial 1996 offer, and represented "a per-share value approximately three and a half times the price paid per share" by plaintiffs for their stock. Id. at 19.

In 1998, plaintiffs filed five separate, but substantially similar actions against defendants (plaintiffs Leatherman, Jansky, and Andrist filed actions on their own behalf; plaintiffs Williams and Brauer filed suit together, as did plaintiffs Wall, Higgins, and McCuskey). Plaintiffs' first claim for relief was for "Breach of Fiduciary Duty" against all defendants in their capacities as officers, directors, and controlling shareholders of Holdings. Id. at 20. In support of this claim, plaintiffs alleged that defendants violated their fiduciary duties to plaintiffs and the other minority shareholders by rejecting Fiserv's initial acquisition offer and subsequently forcing out the plaintiffs and other minority shareholders. In their second claim for relief, plaintiffs asserted that all defendants, in their

capacities as officers, directors, and controlling shareholders of Holdings, engaged in a civil conspiracy "to force certain minority shareholders . . . to sell their . . . stock, in order to deprive [them] . . . of the increase in value in their . . . stock in order to reap that benefit for themselves." Id. at 21. In their third claim for relief, plaintiffs contended that defendants Imhoff, Wilson, and Johnson (but not Huebner), in their capacities as trustees and committee members of the Hanifen Plan, breached their fiduciary duties under ERISA in determining the price at which the Hanifen Plan would repurchase plaintiffs' shares of Holdings stock. More specifically, plaintiffs asserted these three defendants were required, but failed, "to price the shares . . . at fair market value." Id. at 24. Plaintiffs further alleged that these three defendants violated ERISA's prohibition against fiduciaries dealing with plan assets in their own interests "by engaging in a scheme to terminate employees so as to acquire the shares of these minority shareholders and by rejecting the Fiserv acquisition offer in April 1996." Id. at 24-25. As a result of these alleged ERISA violations, plaintiffs asserted they were "entitled to obtain the difference between the amount they were paid for their Hanifen Plan shares at termination, and the shares' fair market value." Id. at 26. In addition, plaintiffs contended they were "entitled to any profits made by the Defendant Hanifen Plan fiduciaries through their misuse of Hanifen Plan assets." Id.

8

Defendants, citing the arbitration provisions in the Form U-4s signed by plaintiffs, moved the district court to stay the proceedings and compel arbitration. Id. at 128. The district court granted defendants' motion with respect to the first and second claims for relief, but denied the motion with respect to plaintiffs' ERISA claims. Id. at 332-38. Defendants subsequently filed timely notices of appeal in each case, and, for purposes of appeal, the cases have been consolidated.

II.

*Standard of review*

We review de novo a district court's grant or denial of a motion to compel arbitration. Gibson v. Wal-Mart Stores Inc., 181 F.3d 1163, 1166 (10th Cir. 1999); Armijo v. Prudential Ins. Co. of America, 72 F.3d 793, 796 (10th Cir. 1995).

*The Form U-4s and the NASD Rules*

As previously noted, the Form U-4s signed by plaintiffs provided:

I agree to arbitrate any dispute, claim or controversy that may arise between me and my firm, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of the [NASD] as may be amended from time to time and that any arbitration award rendered against me may be entered as a judgement in any court of competent jurisdiction.

App. at 100 (item 5).

Among the NASD "rules, constitutions, or by-laws" incorporated by the Form U-4s was the NASD Code of Arbitration Procedure, two rules of which are relevant to this dispute. Rule 10101 "defines the general universe of issues that may be arbitrated," Armijo, 72 F.3d at 798[2], and provides, in pertinent part, for the arbitration of:

> any dispute, claim, or controversy arising out of or in connection with the business of any member of the Association, or arising out of the employment or termination of employment of associated person(s) with any member, with the exception of disputes involving the insurance business of any member which is also an insurance company:
> (a) between or among members;
> (b) between or among members and associated persons;
> (c) between or among members or associated persons and public customers, or others.

App. at 287. Rule 10201 mandates arbitration for the following subset of the universe of disputes outlined in Rule 10101:

> Any dispute, claim, or controversy eligible for submission under [Rule 10101] between or among members and/or associated persons, and/or certain others, arising in connection with the business of such member(s) or in connection with the activities of such associated person(s), or arising out of the employment or termination of employment of such associated person(s) with such member, . . . at the instance of:
> (1) a member against another member;
> (2) a member against a person associated with a member or a person associated with a member against a member; and
> (3) a person associated with a member against a person associated with a member.

---

[2] Armijo involved a previous, but substantially similar, NASD rule.

10

App. at 289.  Exempted from mandatory arbitration are "claim[s] alleging employment discrimination, including a sexual harassment claim, in violation of a statute."  Rule 10201(b) (1999).

*Inapplicability of Wright's "clear and unmistakable" standard*

The district court, relying on Wright v. Universal Maritime Serv. Corp., 119 S. Ct. 391 (1998), concluded plaintiffs' ERISA claims were not subject to mandatory arbitration because the claims were "statutory in origin," and "the Form U-4 and the NASD rules d[id] not explicitly require [their] arbitration." App. at 337.   Although plaintiffs urge us to adopt this same rationale, we decline to do so.

In Wright, the Supreme Court held, in the context of construing a general arbitration clause contained in a collective bargaining agreement (CBA), that any union-negotiated waiver of employees' statutory rights to a judicial forum must be "clear and unmistakable."  119 S. Ct. at 396.  In doing so, the Court was careful to differentiate CBAs from agreements entered into by individual employees.  The Court noted that CBAs involve "a union's waiver of the rights of represented employees," whereas individual agreements involve "an individual's waiver of his own rights."  Id. at 397.  Precisely because CBAs give rise to a "tension between collective representation and individual statutory rights," Gilmer v.

11

Interstate/Johnson Lane Corp., 500 U.S. 20, 35 (1991), the Court believed it was necessary for any union waiver of individual statutory rights in a CBA to "be particularly clear." Wright, 119 S. Ct. at 396. Although the Court did not discuss in detail the standard applicable to agreements entered into by individual employees, it left little doubt that the "clear and unmistakable" standard was inapplicable to such agreements. Id. at 397 (noting that "the 'clear and unmistakable' standard was not applicable" in Gilmer, which involved an individual's waiver of his own statutory rights). Further, the Court indicated that a "broad arbitration clause" in an individual agreement could "embrace federal statutory claims," while the identical clause in a CBA would be construed in a more narrow fashion. Id.

Because the Form U-4s at issue here are individual agreements signed by plaintiffs, we reject the notion that they are subject to Wright's "clear and unmistakable" standard. To the contrary, we conclude they, like the substantially similar agreement signed by the plaintiff in Gilmer, are governed by the Federal Arbitration Act (FAA), 9 U.S.C. § 1 *et seq*. See Gilmer, 500 U.S. at 25; Armijo, 72 F.3d at 797. Under the FAA, a "court must stay proceedings if satisfied that the parties have agreed in writing to arbitrate an issue or issues underlying the district court proceeding." McMahan Sec. Co. v. Forum Capital Markets, 35 F.3d 82, 85 (2d Cir. 1994) (citing 9 U.S.C. § 3). "'[Q]uestions of arbitrability must be

12

addressed with a healthy regard for the federal policy favoring arbitration,' and thus, 'any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'" Armijo, 72 F.3d at 797 (quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626 (1985)).

*Whether plaintiffs' ERISA claims fall within the scope of the arbitration clauses*

We engage in a two-part inquiry to determine whether plaintiffs' ERISA claims fall within the scope of the arbitration clauses contained in the Form U-4s. Mitsubishi Motors, 473 U.S. at 628. Our first task "is to determine whether the parties agreed to arbitrate" the ERISA claims at issue. Id. at 626. "[A]s with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability."[3] Id. If we determine the agreement covers the ERISA claims, our second inquiry is "whether legal constraints external to the parties' agreement foreclose[] the arbitration of those claims." Id. at 628.

To determine whether the parties agreed to arbitrate the ERISA claims asserted by plaintiffs, we must return to the provisions of NASD Rules 10101 and 10201. In order to satisfy both Rules 10101 and 10201, and thus be subject to

---

[3] "By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." Mitsubishi Motors, 473 U.S. at 628.

13

mandatory arbitration, plaintiffs' ERISA claims must be "between" persons specifically listed in Rule 10101, First Liberty Inv. Group v. Nicholsberg, 145 F.3d 647, 651 (3d Cir. 1998), and must "aris[e] in connection with the business" of members, "in connection with the activities of such associated person(s)," or "out of the employment or termination of employment of such associated person(s) with such member." Id.

We have little trouble concluding that plaintiffs' ERISA claims are between "associated persons." NASD By-Law Art. I(q) defines the term "associated person of a member" as: "every sole proprietor, partner, officer, director, or branch manager of any member, or any natural person occupying a similar status or performing similar functions, or any natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by such member." Both the plaintiffs, who were employees of Holdings and involved to one degree or another in the sales of securities, and the defendants, who were directors and/or officers of Holdings, satisfy this definition. See Armijo, 72 F.3d at 799 (concluding that plaintiffs, who were employed as securities salesmen, "engage[d] in the securities business under the control" of their employer, and thus were "associated persons" under the NASD Code). Indeed, in their pleadings filed with the district court, plaintiffs admitted that they and defendants were "associated persons" for purposes of the NASD Code. App.

14

at 165.  Although plaintiffs argue on appeal that, for purposes of the ERISA

claims, the defendants are being sued solely in their capacity as ERISA

fiduciaries, that does not alter the fact that defendants are, in fact, officers and/or

directors of an NASD member institution and, for purposes of the NASD Code,

"associated persons."  Although plaintiffs have attempted to argue that the

provisions of Rule 10101 do not cover disputes between associated persons, the

language of the rule, in particular subparagraph (c), clearly appears to govern

such disputes.[4]  See Armijo, 72 F.3d at 798-99 (construing the phrase "others," as

used in the NASD Rules, to include "associated persons").

The more difficult question is whether the ERISA claims arise "in

connection with the business" of members, "in connection with the activities of

such associated person(s)," or "out of the employment or termination of

employment of such associated person(s) with such member."  Defendants'

primary contention is that plaintiffs' claims arise "out of the employment or

termination of employment of such associated person(s) with such member."

According to defendants, "Plaintiffs' claims would not exist but for their

employment relationship" with HII/Holdings.  Aplt's Opening Brief, at 28.  In a

---

[4]  Even if defendants are not "associated persons," they clearly fall within the category of "others" in subparagraph (c) of Rule 10101.  In other words, the dispute would then be between "associated person" (i.e., the plaintiffs) and "others" (i.e., defendants in their role as ERISA fiduciaries).

secondary argument, defendants also contend that plaintiffs' claims arise "in connection with the business" of HII/Holdings.[5]  In contrast, plaintiffs argue that their ERISA claims do not fall within any of these provisions because they arise solely out of defendants' breaches of their duties as fiduciaries to the Hanifen Plan participants.

To resolve the parties' arguments, we find it necessary to first interpret the phrase "arising out of," as it is used in NASD Rules 10101 and 10201.  To date, we have broadly interpreted the provisions of the NASD Arbitration Code.  For example, prior to 1993, the NASD Code did not expressly require arbitration of claims arising out of the employment or termination of employment of an associated person.  Although some federal courts held that employment discrimination claims were not encompassed by the pre-1993 version of the NASD Code, see, e.g., Prudential Ins. Co. of America v. Lai, 42 F.3d 1299, 1305 (9th Cir. 1994), we held otherwise.  In Armijo, we held that such claims were encompassed by the NASD Code's reference to claims "in connection with [the] activities of such associated person(s)."  72 F.3d at 799.

_____

[5]  In Armijo , this court held that employment discrimination claims filed by former securities salesmen arose "in connection with activities of such associated person(s)" for purposes of NASD Rule 10101 (which, at the time, was referred to as Section 1 of the NASD Code).  72 F.3d at 799.  However, defendants do not appear to be asserting that plaintiffs' ERISA claims arose "in connection with the activities of such associated person(s)."

16

Although the phrase "arising out of" is not defined in Rules 10101 or 10201 (or elsewhere in the NASD Code), we believe it must be broadly construed to mean "originating from," "growing out of," or "flowing from." In reaching this conclusion, we glean support from cases interpreting the identical phrase as used in contracts of insurance. See, e.g., Federal Ins. Co. v. Tri-State Ins. Co., 157 F.3d 800, 804 (10th Cir. 1998) (stating "the phrase 'arising out of' should be given a broad reading such as 'originating from' or 'growing out of' or 'flowing from' or 'done in connection with'--that is, it requires some causal connection to the injuries suffered, but does not require proximate cause in the legal sense"); Merchants Ins. Co. of New Hampshire, Inc. v. United States Fidelity and Guar. Co., 143 F.3d 5, 9 (1st Cir. 1998) (concluding the phrase "arising out of," as used in the insurance contract, was synonymous with "originate" or "come into being"); Acceptance Ins. Co. v. Syufy Enterprises, 81 Cal. Rptr. 2d 557, 561 (Ct. App. 1999) (concluding the phrase "arising out of," as used in the insurance contract, "broadly links a factual situation with the event creating liability, and connotes only a minimal causal connection or incidental relationship"); see also 12 Couch on Insurance 2d § 45:61 (rev. ed. 1981) (noting the phrase "arising out of" generally means originating from, growing out of, or flowing from). Although these cases are obviously not on point, we find them useful because they adopt a broad construction of the phrase "arising out of," similar to the broad

17

construction we must give to arbitration agreements subject to the FAA.

In deciding whether plaintiffs' ERISA claims "originate from," "grow out of," or "flow from" their employment or termination of employment, we find useful an older district court case, Ayres v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 353 F. Supp. 1084 (E.D. Pa. 1973), which involved facts that are sufficiently similar to the case at hand to warrant close review. Plaintiff Percy Ayres worked as an account executive for defendant Merrill Lynch from 1940 until his voluntary retirement in October 1970. Upon his retirement, Ayres was required to sell the substantial number of shares of company stock he had accumulated during his career. Approximately nine months after Ayres' retirement, Merrill Lynch removed the restrictions on stock ownership that had previously required Ayres to dispose of his stock. Merrill Lynch made a public offering of its stock, which more than tripled the price per share in comparison to the price at which Ayres had sold his stock. Ayres filed suit against Merrill Lynch under the federal securities laws, claiming that Merrill Lynch made its decision to become a publicly-owned company in the summer of 1970, but wrongfully concealed this information from him until the summer of 1971. Ayres alleged that if Merrill Lynch had not breached its fiduciary duties toward him, he would not have retired in October 1970 but instead would have continued to work and hold his stock until after the public stock offering.

18

Merrill Lynch moved the district court to stay the proceedings and compel arbitration. Merrill Lynch noted that, during the course of his employment, Ayres had submitted an application to become a registered representative with the New York Stock Exchange (NYSE) and had agreed to be bound by NYSE rules, including Rule 347(b), which compelled arbitration of "[a]ny controversy between a registered representative and any member organization arising out of the employment or termination of such registered representative by and with such member or member organization." 353 F.Supp. at 1086 n.2. The district court, relying on the language of Rule 347(b), concluded that Ayres' claims were subject to arbitration. The court noted that "Ayres was initially permitted to purchase the shares of Merrill Lynch only because he was one of its employees." Id. at 1087. The court further noted that "Ayres' decision to retire when he did might have precipitated Merrill Lynch's exercising its re-purchase option and hence" the dispute also "stemmed from the termination of [Ayres'] employment." Id.

Here, we likewise conclude that plaintiffs' ERISA claims arise out of their employment, or termination from employment, with HII/Holdings. Plaintiffs were entitled to purchase company stock and participate in the Hanifen Plan solely as a result of their employment with HII/Holdings. Further, the necessity for plaintiffs to dispose of their stock was the result of the termination of their employment with HII/Holdings. In other words, it would have been unnecessary for plaintiffs

19

to sell their stock and for defendants to place a value on that stock if plaintiffs' employment was not terminated. Finally, and perhaps most crucial, is the broad nature of plaintiffs' ERISA claims. Although plaintiffs assert on appeal that their ERISA claims are narrowly confined to the allegation that defendants improperly valued their stock, a review of the record on appeal demonstrates otherwise. In particular, plaintiffs' complaints allege, as part of their ERISA claims, that defendants engaged in a course of self-dealing, pursuant to which they (1) rejected Fiserv's initial offer, (2) terminated plaintiffs' employment in order to repurchase their shares at a below-market-value price, and (3) finally accepted Fiserv's offer and profited at plaintiffs' expense. Viewed as a whole, we believe plaintiffs' allegations arise out of their termination in the sense that, without terminating plaintiffs' employment, defendants would not have been able to carry out their alleged scheme. Accordingly, we conclude that plaintiffs' ERISA claims fall within the scope of the arbitration clauses contained in the Form U-4s.

As for defendants' argument that the ERISA claims also fall within the scope of the phrase "in connection with the business of" HII/Holdings, we conclude that is a much weaker, and ultimately meritless, argument. In particular, we are not persuaded that the ERISA claims, which are based upon an alleged scheme on the part of three defendants, have any connection to the business of HII/Holdings, which is the selling of securities.

*Absence of legal constraints foreclosing the arbitration of ERISA claims*

Having concluded that plaintiffs agreed, by way of their Form U-4s, to arbitrate their ERISA claims, the only remaining question is whether there are any external legal restraints that would prevent those claims from being arbitrated. In particular, the question is whether Congress intended to exclude ERISA claims from arbitration. See Shearson/American Express, Inc. v. McMahon, 482 U.S. 220, 238 (1987) (holding that arbitration agreements are enforceable with respect to statutory claims in the absence of evidence of "congressional intent to exclude . . . [those] claims from the dictates of the Arbitration Act"). To date, four circuits have held that Congress did not intend to prohibit arbitration of statutory ERISA claims. See Kramer v. Smith Barney, 80 F.3d 1080, 1084 (5th Cir. 1996); Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 7 F.3d 1110, 1119 (3d Cir. 1993); Bird v. Shearson Lehman/American Express, Inc., 926 F.2d 116, 119-20 (2d Cir. 1991); Arnulfo P. Sulit, Inc. v. Dean Witter Reynolds, Inc., 847 F.2d 475, 478 (8th Cir. 1988); see also G. Richard Shell, ERISA and Other Federal Employment Statutes: When is Commercial Arbitration an "Adequate Substitute" for the Courts?, 68 Tex. L. Rev. 509, 572-73 (Feb. 1990) ("A careful review of ERISA discloses that, if Congress intended anything with respect to enforcement of the FAA, it intended to preserve the full application of the FAA in ERISA cases."). Having carefully examined the opinions, we agree with those circuits

21

and likewise conclude that Congress did not intend to prohibit arbitration of ERISA claims.

III.

The judgment of the district court is REVERSED and the case is REMANDED with directions to stay the proceedings and compel arbitration of plaintiffs' ERISA claims.