**PACIFIC INSURANCE COMPANY (in its own right and as assignee of Plaintiff Below, Consolidated Rail Corporation, a corporation of the Commonwealth of Pennsylvania), Defendant Below–Appellant,**

v.

**LIBERTY MUTUAL INSURANCE COMPANY, Defendant Below–Appellee.**

No. 486, 2007.

Supreme Court of Delaware.

Submitted: June 25, 2008.

Decided: Aug. 20, 2008.

Kevin J. Connors, Esquire, of Marshall, Dennehey, Warner, Coleman and Goggin, Wilmington, DE; Of Counsel: William G. Ballaine (argued), Michael L. Gioia, Ameet B. Kabrawala, Esquires, of Landman Corsi Ballaine & Ford, P.C., New York City, for appellant.

Susan List Hauske, Esquire (argued), of Tybout Redfearn & Pell, Wilmington, DE, for appellee.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS, and RIDGELY, Justices, constituting the Court en Banc.

RIDGELY, Justice:

This insurance coverage dispute arises from separate railroad crossing accidents during a road construction project. Two wrongful death actions were filed as a result. These actions were settled but a dispute over coverage under two insurance policies remains. Defendant–Appellant Pacific Insurance Company ("Pacific"), in its own right and as assignee of plaintiff-below Consolidated Rail Corporation ("Conrail"), appeals from the Superior Court's grant of summary judgment in favor of defendant-appellee Liberty Mutual Insurance Company ("Liberty") and Conrail with respect to the insurers' duties to defend.[1]

Pacific makes two arguments on appeal. First, it asserts that the Superior Court erred in holding that Liberty does not owe a duty to defend Conrail in the wrongful death actions as an "additional insured" under the Liberty primary commercial general liability policies. Second, it contends that the Superior Court erred in holding that Pacific has a duty to defend Conrail under its railroad force account insurance policy. We conclude that both Liberty and Pacific owe a duty to defend Conrail under their respective policies. Accordingly, we affirm in part, reverse in part, and remand for further proceedings consistent with this Opinion.

## I. Facts

In August 1987, the Delaware Department of Transportation ("DelDOT") informed Conrail that DelDOT would be widening and improving State Route 15 (the "Route 15 Project"). The Route 15 Project included widening, reconfiguring, and resurfacing of portions of Route 15, including a portion of Route 15 that crossed a section of railroad tracks owned and operated by Conrail (the Delmarva Secondary Track, or the "Delmarva Secondary")[2] in Mount Pleasant, Delaware (the "Mt. Pleasant Crossing"). James Julian, Inc. ("Julian") was awarded the contract for the Route 15 Project (the "DelDOT/Julian Contract").

1. The Superior Court's final order dated August 20, 2007, entered judgment pursuant to Superior Court Civil Rule 54(b) based on two orders and opinions: *Consolidated Rail Corp. v. Liberty Mutual Insurance Co.*, No. 97C–10–011 (Del.Super. Apr. 30, 2004) and *Consoli-*

*dated Rail Corp. v. Liberty Mutual Insurance Co.*, No. 97C–10–001, 2005 WL 697943 (Del.Super. March 16, 2005).

2. The Delmarva Secondary runs from Newark, Delaware to Indian River, Delaware.

DelDOT informed Conrail that as part of the Route 15 Project, the Mt. Pleasant Crossing would have to be improved (the "Crossing Project") and instructed Conrail to prepare estimates for constructing the required improvements. After Del-DOT approved Conrail's estimate for the Crossing Project, DelDOT and Conrail entered into a contract (the "Del-DOT/Conrail Contract"), which, among other things, mandated that all contractors working on projects involving Conrail grade crossings obtain liability insurance required under federal and state law.

### 1. The DelDOT/Julian Contract and the policies Julian purchased from Liberty

Specifically, the DelDOT/Julian Contract required Julian to purchase three insurance policies: (1) contractor's public liability insurance (which covered Julian's operations),[3] (2) contractor's protective public liability insurance (which covered Julian's subcontractors' operations),[4] and (3) Railroad Protective Public Liability Insurance ("RPPLI") (which covered Conrail against any liability arising out of Julian's construction activities at or near the Mt. Pleasant Crossing).[5] Julian purchased two successive commercial policies from Liberty (the "Liberty Policies"), which covered Julian's liability for personal injury arising out of Julian's participation in the Route 15 Project.[6] Julian did not, however, purchase RPPLI as the DelDOT/Julian Contract required.[7]

The Liberty Policies obligate Liberty to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies. [Liberty] will have the right and duty to defend any 'suit' seeking those damages."[8] Coverage applies to "bodily injury" or "property damage," but only if the "'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory'" and during the policy period.[9] The Liberty Policies also contain an "Additional Insured—Blanket" ("Additional Insured Clause"), which provides:

3. The limits of this insurance under the contract were to be "not less than $2,000,000 single limit, bodily injury and/or property damage combined, for damages arising out of bodily injuries to or death of all persons in any one occurrence and for damage to or destruction of property, including the loss of use thereof, in any one occurrence."

4. The limits of this insurance under the contract were to be "not less than $2,000,000 single limit, bodily injury and/or property damage combined, for damages arising out of bodily injuries to or death of all persons in any one occurrence and for damage to or destruction of property, including the loss of use thereof, in any one occurrence."

5. The limits of this insurance under the contract were to be "not less than $2,000,000 single limit, bodily injury and/or property damage combined, for damages arising out of bodily injuries to or death of all persons in any one occurrence and for damage to or

destruction of property, including the loss of use thereof, in any one occurrence. Such insurance shall be furnished with an aggregate of not less than $6,000,000 for all damages as a result of more than one occurrence."

6. Each policy provided coverage of $1 million per occurrence, $2 million in the aggregate for bodily injury and property damage, and lists Julian as the named insured.

7. Conrail asserted a claim for damages against Julian for breach of contract, but the Superior Court granted Julian's motion to dismiss and held that the claim was barred by the statute of limitations.

8. Policy Nos. TB 1–131–447322–021, TB 1–131–447322–022, Commercial General Liability Coverage Form, Coverage A.1.a ("Liberty Policies").

9. *Id.* at Coverage A.1.b.

WHO IS AN INSURED is amended to include as an insured any person or organization for whom you have agreed in writing to provide Liability insurance, *but only with respect to liability arising out of your operations* or premises owned by or rented to you.

*This insurance does not apply to any person or organization for whom you have procured separate liability insurance while such insurance is in effect,* regardless of whether the scope of coverage or limits of insurance of this policy exceed those of such other insurance or whether such insurance is valid and collectible.[10]

## 2. The DelDOT/Conrail Contract and the policies Conrail purchased from Pacific

The DelDOT/Conrail Contract required Conrail to be covered by a railroad force account insurance policy, which would insure Conrail for liability for bodily injury arising out of work performed at the Mt. Pleasant Crossing by Conrail forces during the Crossing Project. Conrail purchased this force account insurance from Pacific (the "Pacific Force Account Policy"). The Pacific Force Account Policy provides claims-made coverage of $5 million per "incident":

> [Pacific] will pay on behalf of the Insured for Ultimate Net Loss which the Insured must legally pay as compensatory damages and Defense Expenses, because of Bodily Injury, ... which this insurance applies which results from an

Incident which commences during the applicable Policy Period, arising out of or resulting from the Force Account Work conducted by the Named Insured.[11]

"Force Account Work" is defined as "work or operations performed by employees of the Named Insured [Conrail] for federal, state, municipal or other political subdivisions or governmental legal entities or for companies, ... wherein the Named Insured is reimbursed for the cost of such work or operations...."[12]

## 3. The accidents and the wrongful death actions

During the course of construction of the Route 15 Project and the Crossing Project, two separate accidents occurred which resulted in deaths at the Mt. Pleasant Crossing. On May 27, 1992, Bruce D. Flowers was driving eastbound on Route 15 when his car collided with a southbound Conrail freight train. On July 12, 1992, Lynn S. Saunders and her passengers, Lori J. White and Kathryn A. Fydenkevez, were traveling westbound on Route 15 and collided with a northbound Conrail freight train at the Mt. Pleasant Crossing. Both Flowers and Saunders and her passengers died from their injuries. The estates and survivors of all decedents filed separate wrongful death and survivorship actions against Julian and Conrail (the "Flowers and Fydenkevez Complaints" or the "Complaints").

The Flowers and Fydenkevez Complaints were filed on January 10, 1994.[13]

---

10. *Id.* at Additional Insured—Blanket, Commercial General Liability Coverage Part, Section II ("Additional Insured Clause") (emphasis added). "Liability insurance" is not defined in the policy.

11. Pacific Railroad Force Account Insurance Policy No. PRR–001580, at I.1.

12. *Id.* at IV.15.

13. The Fydenkevez Complaint was initially filed against Julian only, but later amended to include Conrail. The Flowers Complaint was initially filed against Julian and Conrail, and later amended to include ATAP Group, Inc., the State of Delaware, and DelDOT.

Both alleged that Julian, its agents, servants, and employees were negligent in the "major repairs" of the Route 15 Project, creating a dangerous condition which they failed to eliminate, thereby proximately causing the death of the aforementioned individuals. Among other things, the Complaints alleged that Julian was negligent in failing to post adequate warning signs and signals, obstructing warning signs and signals designed to notify highway users of the Mt. Pleasant Crossing and oncoming trains, removing such signs and signals, failing to employ a flagman, and failing to warn of the dangerous condition of its work site and the Mt. Pleasant Crossing.[14]

The Flowers and Fydenkevez Complaints also alleged negligence claims against Conrail. They claimed that Conrail knew or should have known that it had created a dangerous condition at the Mt. Pleasant Crossing, failed to warn of this condition properly and adequately, and failed to remedy the condition. They also alleged that Conrail was negligent in, among other things, creating a confusing and dangerous condition during the road construction at the Mt. Pleasant Crossing, improperly placing flashing lights, warning signs and other warning signals at the Mt. Pleasant Crossing, failing to post adequate warning devices at the Mt. Pleasant Crossing, and failing to utilize a flagman there.[15]

Liberty provided a defense for Julian in the wrongful death suits. Conrail sought defense and indemnity coverage for the Flowers and Fydenkevez Complaints under the Liberty Policies, but Liberty de-

nied coverage. Conrail then sought coverage under the Pacific Force Account Policy, which Pacific denied. Conrail filed a declaratory judgment action in Superior Court on October 1, 1997, claiming that both Liberty and Pacific had wrongly refused to defend and indemnify Conrail with respect to the Flowers and Fydenkevez claims. The estates and survivors of the decedents eventually settled their claims against Julian and Conrail, leaving only Conrail's claims for contribution and indemnification against Liberty and Pacific.

### 4. The motions for summary judgment in the Superior Court

Pacific filed two motions for summary judgment in the declaratory judgment action, one seeking a declaration that Pacific had no obligation to reimburse Conrail for the costs of defending the Flowers and Fydenkevez actions, and the second to construe the "Other Insurance" provisions in the Liberty and Pacific Force Account policies. Conrail sought summary judgment on the existence and extent of the duties of both Liberty and Pacific to defend Conrail in the Flowers and Fydenkevez actions. Liberty cross-moved for summary judgment to determine the extent of its obligation to defend and/or indemnify Conrail.[16]

The Superior Court granted partial summary judgment in favor of Conrail as to Pacific's duty to defend Conrail. That court found that the work conducted at the Mt. Pleasant Crossing as alleged in the Complaints was part of the Route 15 Pro-

---

**14.** The Complaints refer to the Mt. Pleasant Crossing as the "railroad-highway grade crossing."

**15.** The Fydenkevez Complaint, as amended to include Conrail as a defendant, asserts the identical allegations of negligence against Conrail as in the Flowers Complaint.

**16.** Julian also filed a similar motion against Liberty to determine the extent of Liberty's obligation to provide coverage for all of Julian's losses since the litigation had begun, which is not addressed in the instant appeal. *See also* supra note 7.

ject and was "work or operations" for the State of Delaware within the meaning of the Pacific Force Account Policy.[17] The court also concluded that all of the claims raised were causally connected, in some fashion, to Conrail's force account work personnel and their duty to protect the public while on site. As a result, the court found it was readily apparent that a causal connection between Conrail's force account work and the deaths in question had been pled with sufficient particularity so as to obligate Pacific to defend Conrail.[18] The court granted Conrail's motion for summary judgment and denied Pacific's motion, holding that Pacific had a duty to defend Conrail unless and until any claims being pursued were determined to be beyond the coverage of the Pacific Force Account Policy.[19]

The Superior Court also construed the Liberty Policies to determine whether Conrail was an "additional insured" as defined in the Additional Insured Clause. The Superior Court found that that clause was unambiguous and that its express terms provided coverage for Conrail only with respect to liability "arising out of" Julian's operations.[20] In interpreting the "arising out of" provision and concluding that Liberty was not required to defend Conrail, the Superior Court reasoned:

> If the Flowers or Fydenkevez Complaints had contained allegations that Conrail's liability was based solely upon Julian's operations or personnel, Conrail would appear to be covered under the "plain language and meaning" of the policy. [The Liberty Policies] would only provide coverage for Conrail where Conrail could be held responsible via the acts of Julian thru Julian's employees or agents, based upon some legal relationship with Julian, e.g., agency or *respondeat superior*. Where liability is based upon the acts of Conrail by and thru [sic] Conrail's agents or employees, Conrail would not be an additional insured under the Liberty policy.
>
> Again, while Conrail's participation in the Route 15 Project appears to have been intertwined with Julian's effort, the alleged negligence of Conrail was separate and distinct from the allegations made against Julian. It did not "arise out of or result from" Julian's operations. Each entity was alleged to be at fault in its own way, and the liability of Conrail is not premised upon its relationship with Julian. Liberty is therefore not required to defend or insure Conrail for liability which arose out of its own negligence.[21]

In the alternative, the Superior Court also held that the claims were not covered under the "insured contract" definition, which it read to exclude injuries or losses taking place with fifty feet of the railroad crossing.[22] Because the Superior Court concluded that coverage was not available under the Liberty Policies, it granted summary judgment for Liberty and denied Conrail's cross-motion for partial summary judgment. As a result of the court's conclusion that Pacific alone had a duty to defend, Pacific's remaining motion to construe the "other insurance" provisions of

---

**17.** *See Consol. Rail Corp. v. Liberty Mut. Ins. Co.*, No. 97C–10–011, at 15–23 (Del.Super. Apr. 30, 2004).

**18.** *Id.* at 22–23.

**19.** *Id.* at 23.

**20.** *Id.* at 26.

**21.** *Id.* at 26–27.

**22.** *Id.* at 29. The Superior Court also concluded that Julian's failure to procure RPPLI did not constitute an insured "occurrence" under the Liberty Policies. *Id.* at 28.

the Liberty and Pacific Force Account policies was rendered moot.[23]

The Superior Court granted re-argument.[24] After additional briefing and argument, the Superior Court reaffirmed its decision that Pacific owed a duty to defend under the Pacific Force Account Policy.[25] In November 2005, the parties agreed to dismiss with prejudice all claims that were brought, or could have been brought, by or against Julian and Conrail. Pacific reached an agreement providing for, among other things, the assignment to Pacific of Conrail's claims, rights and damages against Liberty, including all appellate rights. The parties then moved for, and the Superior Court issued, a final order, from which this appeal is taken.

## II. Discussion

 We review the grant or denial of summary judgment *de novo*.[26] We also

exercise *de novo* review of the conclusions of law made in interpreting insurance contracts.[27] A grant of summary judgment cannot be sustained where there is a genuine issue of material fact.[28] Here, the only questions raised on appeal are matters of contract interpretation. The parties agree that Delaware law applies to the interpretation of the Liberty Policies.

 "In construing an insurer's duty to indemnify and/or defend a claim asserted against its insured, a court typically looks to the allegations of the complaint to decide whether the third party's action against the insured states a claim covered by the policy, thereby triggering the duty to defend."[29] The test is whether the underlying complaint, read as a whole, alleges a risk within the coverage of the policy.[30] Determining whether an insurer is bound to defend an action against its insured requires adherence to the following

**23.** In its April 2004 opinion, the Superior Court noted that it would only need to address Pacific's motion on the "other insurance" provisions of the Pacific and Liberty policies and determine the order or priority of the insurer's coverage "if both insurers are determined to have had an obligation to defend Conrail" *Id.* at 13. Because the Superior Court determined that Pacific alone had a duty to defend Conrail and Conrail was not an insured for purposes of the Liberty Policies, the Court found that Pacific's motion was moot as the "other insurance" provisions of the Liberty and Pacific Policies were inapplicable. *Id.* at 30–31, 32.

**24.** *Consol. Rail Corp. v. Liberty Mut. Ins. Co.,* No. 97C–10–001, at 2, 2005 WL 697943, at *1 (Del.Super. March 16, 2005). In its subsequent order, the Superior Court noted that the only issue that was briefed by the parties, and therefore the only issue it was addressing, was the duty to defend by Conrail and Pacific.

**25.** The Court also granted Julian's motion for summary judgment as to Liberty's duty to defend Julian. *Id.* at 14, 2005 WL 697943, at *5; *supra* note 16.

**26.** *Grabowski v. Mangler,* 938 A.2d 637, 641 (Del.2007); *Lank v. Moyed,* 909 A.2d 106, 108 (Del.2006); *Wilmington Trust Co. v. Aetna Cas. & Sur. Co.,* 690 A.2d 914, 916 (Del.1996); *Williams v. Geier,* 671 A.2d 1368, 1375 (Del. 1996).

**27.** *Eon Labs Mfg., Inc. v. Reliance Ins. Co.,* 756 A.2d 889, 892 (Del.2000); *accord Lank,* 909 A.2d at 108; *Emmons v. Hartford Underwriters Ins. Co.,* 697 A.2d 742, 744–45 (Del. 1997).

**28.** *Lank,* 909 A.2d at 108.

**29.** *Am. Ins. Group v. Risk Enter. Mgmt., Ltd.,* 761 A.2d 826, 829 (Del.2000). *See also id.* ("The rationale underlying this principle is that the determination of whether a party has a duty to defend should be made at the outset of the case, both to provide the insured with a defense at the beginning of the litigation and to permit the insurer, as the defraying entity, to control the defense strategy.").

**30.** *Cont'l Cas. Co. v. Alexis I. duPont Sch. Dist.,* 317 A.2d 101, 103 (Del.1974).

principles: (1) where there is some doubt as to whether the complaint against the insured alleges a risk insured against, that doubt should be resolved in favor of the insured; (2) any ambiguity in the pleadings should be resolved against the carrier; and (3) if even one count or theory alleged in the complaint lies within the policy coverage, the duty to defend arises.[31]

### A. The Liberty Policies require Liberty to defend Conrail

■ Pacific's first argument raises the question of whether Conrail is covered under the Additional Insured Clause of the Liberty Policies.[32] "The scope of an insurance policy's coverage is prescribed by the language of the policy."[33] The Additional Insured Clause[34] of the Liberty Policies has two aspects. The first expands the definition of an insured to include any person or organization for whom Julian has agreed in writing to provide liability insurance; the second restricts the coverage of an insured to only liability arising out of Julian's operations.

### 1. RPPLI is "liability insurance" under the Liberty Policies

■ Liberty contends that the first aspect of the Additional Insured Clause is not met; that is, in order for Pacific to qualify as an additional insured under the policy, Julian must have agreed in writing to provide "liability insurance" to Conrail. Liberty argues that the DelDOT/Julian Contract required Julian to purchase RPPLI, a specific insurance, but not to provide "liability insurance" to Conrail, because the latter term refers only to general liability insurance. Liberty reasons that if general liability policies were meant to cover RPPLI, there would be no reason to procure specific RRPLI, which costs an additional premium.

We find that the term "liability insurance" as it appears in the Additional Insured Clause is unambiguous. We therefore give that term its plain and ordinary meaning,[35] which would encompass Railroad Protective Public Liability Insurance, the species of liability insurance required by the DelDOT/Julian Contract.[36] But, even if "liability insurance" were found to

---

**31.** *Id.* at 105.

**32.** Pacific advances this argument in its capacity as the assignee of Conrail's claims.

**33.** *Emmons,* 697 A.2d at 745.

**34.** *See* Additional Insured Clause ("WHO IS AN INSURED is amended to include as an insured any person or organization for whom you have agreed in writing to provide Liability insurance, but only with respect to liability arising out of your operations or premises owned by or rented to you.").

**35.** *See, e.g.,* BLACK'S LAW DICTIONARY 806 (7th ed. 1999) (defining liability insurance as "an agreement to cover a loss resulting from one's liability to a third party, such as a loss incurred by a driver who injuries a pedestrian"); BLACK'S LAW DICTIONARY 723 (5th ed. 1979) ("Liability insurance is that form of insurance which indemnifies against liability

on account of injuries to the person or property of another.").

**36.** *See* DelDOT/Julian Contract (requiring Julian to procure Railroad's Protective Public Liability insurance with limits "not less than *$2,000,000* single limit, bodily injury and/or property damage combined, for damages arising out of bodily injuries to or death of all persons in any one occurrence and for damage to or destruction of property, including the loss of use thereof, in any one occurrence"). *See also St. Paul Fire & Marine Ins. Co. v. CSX Transp., Inc.,* 502 F.Supp.2d 792, 799 (C.D.Ill.2007) ("A railroad protective liability policy provides coverage for injuries arising out of acts or omissions of either the insured or the designated contractor. This type of policy applies to liability for bodily injury which is related to or in connection with the 'work' described in the Declarations.") (citations omitted).

be ambiguous and could be read (as Liberty argues) to exclude the agreement to purchase RPPLI, Liberty's argument still fails because ambiguities are construed strongly in favor of the insured, not the insurer.[37] Under the plain language of the DelDOT/Julian Contract, Julian agreed to obtain RPPLI in the name of Conrail covering any liability arising out of Julian's construction activities at or near the Mt. Pleasant Crossing. Therefore, Conrail satisfies the first aspect of the Additional Insured Clause.[38]

### 2. "Arising out of" is construed broadly under Delaware law

We turn next to the issue of whether Conrail, as an insured under the Liberty Policies, falls within the second aspect or condition of the Additional Insured Clause; that is, whether the coverage Conrail seeks is based on liability arising out of Julian's operations. We agree with the Superior Court that the language of the Additional Insured Clause is unambiguous and that its plain meaning controls. By its express terms, the Liberty Policies provide coverage for Conrail "only with respect to liability arising out of [Julian's] operations."[39] Thus, our focus must be upon the scope of the term "arising out of" as defined in the Liberty Policies.

This Court has previously held that, under general insurance contract principles, and consistent with New York law, the term "arising out of" "is one that lends itself to uncomplicated common understanding."[40] Specifically, "if there is some meaningful linkage between the product and the third party claim, the 'arising out of' language unambiguously applies."[41] Cases from other jurisdictions also establish extensive support for a broad construction of that phrase.[42] We

---

**37.** *Emmons,* 697 A.2d at 745 ("If ambiguity exists in the contract, it is construed strongly against the insurer, and in favor of the insured, because the insurer drafted the language that is interpreted.") (quoting *Hallowell v. State Farm Mut. Auto. Ins. Co.,* 443 A.2d 925, 926 (Del.1982)) (internal quotation marks omitted); *Steigler v. Ins. Co. of N. Am.,* 384 A.2d 398, 400 (Del.1978) ("[W]here ambiguous, the language of an insurance contract is always construed most strongly against the insurance company which has drafted it.").

**38.** The fact that Julian did not actually obtain RPPLI is irrelevant to any interpretation of the clause itself.

**39.** The exception to this coverage does not apply because Julian did not procure separate liability insurance (RPPLI) as was required under the DelDOT/Julian Contract. *See* Additional Insured Clause ("This insurance does not apply to any person or organization for whom you have procured separate liability insurance while such insurance is in effect, regardless of whether the scope of coverage or limits of insurance of this policy exceed those of such other insurance or whether such insurance is valid and collectible.").

**40.** *Eon Labs,* 756 A.2d at 893.

**41.** *Id.* at 894.

**42.** *See, e.g., Williams v. Imhoff,* 203 F.3d 758, 765–66 (10th Cir.2000) ("Although the phrase 'arising out of' is not defined ... it must be broadly construed to mean 'originating from,' 'growing out of,' or 'flowing from.' "); *Fed. Ins. Co. v. Tri–State Ins. Co.,* 157 F.3d 800, 804–05 (10th Cir.1998) ("[T]he general consensus [is] that the phrase 'arising out of' should be given a broad reading such as 'originating from' or 'growing out of' or 'flowing from' or 'done in connection with'—that is, it requires some causal connection to the injuries suffered, but does not require proximate cause in the legal sense.") (quoting cases); *Mid–Continent Cas. Co. v. Swift Energy Co.,* 206 F.3d 487, 496–500 (5th Cir.2000); *Fibreboard Corp. v. Hartford Accident & Indem. Co.,* 16 Cal.App.4th 492, 20 Cal.Rptr.2d 376, 383 (1993) (explaining that "arising out of" is broader than "caused by" and "ordinarily understood to mean 'originating from' 'having its origin in,' 'growing out of' or 'flowing from' or in short, 'incident to, or having connection with' ") (quoting *Cont'l Cas. Co. v. City of Richmond,* 763 F.2d 1076, 1080 (9th

agree and hold that under Delaware law, the term "arising out of" is broadly construed to require some meaningful linkage between the two conditions imposed in the contract. Here, Liberty's coverage of Conrail (that is, whether Liberty has a duty to defend Conrail) under the Additional Insured Clause depends on whether there was a meaningful linkage between Julian's operations and Conrail's resulting liability in the wrongful death actions.

### 3. The Complaints alleged that Conrail's liability arises out of Julian's operations

Liberty takes the position that the Flowers and Fydenkevez Complaints allege specific acts and omissions against Conrail as a result of Conrail's own work, and not because of Julian's operations. The Superior Court reasoned that the only way a meaningful linkage could be established would be if Conrail's alleged liability was based upon Julian's operations or personnel under an agency or vicarious liability theory, neither of which were alleged. Although that might be one way a meaningful linkage could be established, it is not the only way.

The Flowers and Fydenkevez Complaints alleged, among other things, that Julian failed to employ a flagman, and removed and obstructed warning signs and signals at the Mt. Pleasant Crossing. A meaningful linkage between these opera-

tions and the claims of negligence brought against Conrail can be found in the allegations that Conrail "had notice and knowledge of the dangerous condition which had been created" at the Mt. Pleasant Crossing, yet failed to exercise reasonable care to eliminate it.[43] A reasonable inference that can be drawn from these allegations is that: (i) Conrail had notice that Julian's operations had negligently created a dangerous condition at the Mt. Pleasant Crossing, and (ii) aware of that dangerous condition, Conrail had a duty to remedy the condition and for failing to do so, was liable.

Conrail's notice that a dangerous condition had been created can be inferred, apart from Julian's operations, from the allegation that Conrail "permitted trees, bushes, undergrowth and other vegetation to obstruct the view of the railroad tracks from the highway."[44] Even if the Complaints can be read in two ways, any doubt must be resolved in favor of the insured. Because the Flowers and Fydenkevez Complaints can be read as alleging a meaningful linkage between Julian's operations and Conrail's resulting liability, the second condition of the Additional Insured Clause is met. Because at least one theory alleged in the Complaints triggers coverage under the Liberty Policies, Conrail is an insured under the policy, and Liberty had a duty to defend Conrail.[45]

Cir.1985)); *see also Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.,* 913 So.2d 528, 535 (Fla.2005) (noting that "[m]ost other jurisdictions interpret the phrase 'arising out of' to encompass a meaning broader than mere proximate cause" and citing cases).

43. *Flowers v. Julian* Am. Compl. ¶¶ 18, 19, 20; *Fydenkevez v. Julian* Am. Compl. ¶¶ 16, 17, 18.

44. *Flowers* Am. Compl. ¶ 15, *Fydenkevez* Am. Compl. ¶ 13.

45. The Liberty Policies apply to "bodily injury" and "property damage" only if the "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory" and if it occurs during the policy period. Liberty Policies, I.A.1.b. The Liberty Policies define "coverage territory" to include the United States and define "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.* at V.4.a, V.9. (A153, 188). The accidents alleged within the Flowers and Fydenkevez Com-

#### 4. The "insured contract" provision does not apply

█ The Superior Court also held, in the alternative, that the Flowers and Fydenkevez claims were not covered under the Liberty Policies because coverage for an "insured contract" excludes injuries or losses that occur within fifty feet of railroad property.[46] In relevant part, the Liberty Policies define "insured contract" to include "[t]hat part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for 'bodily injury' or 'property damage' to a third person or organization...."[47] Further, an "insured contract" also "does not include that part of any contract or agreement ... [t]hat indemnifies any person or organization for 'bodily injury' or 'property damage' arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass or crossing."[48]

This analysis is relevant only to an exclusion from coverage for bodily injury claims where the insured's obligation to pay damages to a third party is based on the insured's assumption of liability in an "insured contract" and comes into play only where the coverage sought is based on liability assumed under such a contract. Here, Conrail's potential obligation to pay damages is not based on Conrail's having assumed liability under an "insured contract." It is based on claims in the wrongful death actions that Conrail was negligent. Because the rights asserted by Conrail are not based on an "insured contract," the Superior Court's denial of coverage predicated on liability arising out of an "insured contract" was erroneous.

#### 5. The Liberty Policies are enforceable

█ Liberty also argues that a construction in favor of Conrail would provide coverage for Conrail's own negligence in contravention to legislatively defined public policy that precludes contractual indemnification for a party's own negligence.[49] Pacific responds that 6 *Del. C.* § 2704 applies to construction contracts, not to liability insurance policies issued to insure against losses or damages due to the insured's own negligence. In *Chrysler Corp. v. Merrell & Garaguso, Inc.*, this Court addressed a similar issue in determining whether "the statutory restriction in 6 *Del. C.* § 2704, which precludes an owner from requiring a contracting party to indemnify against the indemnitee's own negligence, also invalidate[s] the enforceability of lia-

---

plaints are "occurrences" which took place in the coverage territory and occurred within the policy period.

46. *Consol. Rail Corp. v. Liberty Mut. Ins. Co.*, No. 97C–10–011, at 29 (Del.Super. Apr. 30, 2004).

47. Liberty Policies, V.6.f. (A153, 188). "Tort liability means a liability that would be imposed by law in the absence of any contract or agreement." *Id.* The policies also define "insured contract" to mean "[a]ny easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad." *Id.* at V.6.c.

48. *Id.* at V.6 (unnumbered) a.

49. *See J.S. Alberici Constr. Co., Inc. v. Mid–West Conveyor Co.*, 750 A.2d 518, 521 (Del. 2000) ("[6 *Del. C.* § 2704(a)] is clear on its face: a contractual provision requiring one party to indemnify another party for the second party's own negligence, whether sole or partial, is against public policy and is void and unenforceable. Courts are not free to disregard that declaration of policy.") (internal quotation marks omitted); 6 *Del. C.* § 2704.

bility insurance purchased for the benefit of the owner."[50] We held: "While we agree that the requirement to purchase insurance may, under certain circumstances, be unenforceable, we reject the inference that such insurance, once secured, is unenforceable against the issuer of the insurance."[51] Further:

[T]he insurance savings provision reflected in [6 Del. C. § 2704(b)] is a statement of legislative purpose that cannot be negated by an all-encompassing construction of the anti-indemnification policy set forth in [6 Del. C. § 2704(a)]. The savings provision has meaning only if it cannot be used as a shield by insurers to decline coverage for insurance once purchased and duly issued to any insured, however identified or designated.[52]

The insurance at issue here was purchased from Liberty by Julian and is enforceable against Liberty. "Insurance companies are sophisticated entities who can protect their own interests either in refusing to issue additional insured coverage or restricting such coverage with notice to the insured or third parties."[53] Consistent with our holding in *Chrysler*, Liberty had

a duty to defend Conrail. The Superior Court erred in granting summary judgment in favor of Liberty.

## B. The Pacific Force Account Policy requires Pacific to defend Conrail

 Pacific also argues that the Superior Court erred in holding that Pacific owes Conrail a duty to defend the wrongful death actions under the Pacific Force Account Policy. The parties agree that Pennsylvania law governs the interpretation of the Pacific Force Account Policy. Under Pennsylvania law, an insurer is obligated to defend if the factual allegations of the complaint comprehend an injury that is actually or potentially within the scope of the policy.[54] As the Pennsylvania Supreme Court has explained, its cases consistently hold that an insurer's "obligation to defend arises whenever the complaint filed by the injured party may *potentially* come within the coverage of the policy."[55] When deciding whether a duty to defend exists, the court must compare the allegations in the complaint with the language of the insured's policy, construing them together to determine the insurer's obligations to the insured.[56] The factual alle-

**50.** *Chrysler Corp. v. Merrell & Garaguso, Inc.,* 796 A.2d 648, 649 (Del.2002).

**51.** *Id.*

**52.** *Id.* at 653.

**53.** *Id. See also DeLucca v. KKAT Mgmt., L.L.C.,* 2006 WL 224058, at *2 (Del.Ch.) ("[I]t is not the job of a court to relieve sophisticated parties of the burdens of contracts they wish they had drafted differently but in fact did not. Rather, it is the court's job to enforce the clear terms of contracts.")

**54.** *Erie Ins. Exch. v. Transamerica Ins. Co.,* 516 Pa. 574, 533 A.2d 1363, 1368 (1987); *accord Cadwallader v. New Amsterdam Cas. Co.,* 396 Pa. 582, 152 A.2d 484, 489 (1959) ("It is clear that where a claim potentially may become one which is within the scope of

the policy, the insurance company's refusal to defendant at the outset of the controversy is a decision it makes at its own peril."). *See also Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co.,* 589 Pa. 317, 908 A.2d 888, 896 (2006) ("It is well established that an insurer's duties under an insurance policy are triggered by the language of the complaint against the insured.").

**55.** *Erie Ins. Exch.,* 533 A.2d at 1368 (quoting *Gedeon v. State Farm Mut. Auto. Ins. Co.,* 410 Pa. 55, 188 A.2d 320 (1963)).

**56.** *Donegal Mut. Ins. Co. v. Baumhammers,* 595 Pa. 147, 938 A.2d 286, 290 (2007) (quoting *Gene's Rest. Inc. v. Nationwide Ins. Co.,* 519 Pa. 306, 548 A.2d 246, 247 (1988)). *See also id.* at 290–91 ("Therefore, 'a carrier's duties to defend and indemnify an insured in

gations of the complaint are taken as true and the complaint should be "liberally construed with all doubts as to whether the claims may fall within the coverage of the policy to be resolved in favor of the insured."[57] Thus, an insured's "duty to defend and indemnify an insured in a suit brought by a third party depends upon a determination of whether the third party's complaint triggers coverage."[58] "[W]e must look to two sources to decide whether a duty to defend exists. We must interpret the insurance policy to determine the scope of coverage. Then, we must analyze the complaint filed against the insured to determine whether the claims asserted potentially [fall] within that coverage."[59]

The Flowers and Fydenkevez Complaints alleged, among other things, that Conrail was negligent for having "improperly placed flashing lights, warning signs and other warning signals at the railroad-highway grade crossing."[60] Pacific conceded before the Superior Court that "DelDOT's requirement that Conrail relocate or re-install new flashing lights[ ] constituted 'force account' work within the

meaning of the policy."[61] We agree with the Superior Court that these activities were "work or operations" for the State of Delaware within the meaning of the Pacific Force Account Policy.

As the Superior Court correctly noted, it having been found that Conrail was performing "force account work" as defined under the Pacific Force Account Policy, the inquiry then becomes whether the allegations in the Complaints potentially come within the policy coverage.[62] We agree with the Superior Court that the allegations against Conrail pertain to precautions which, as alleged in the Flowers and Fydenkevez Complaints, should have been taken during the construction at the Mt. Pleasant Crossing.[63] Because the allegations in the Flowers and Fydenkevez Complaints are causally connected to the force account work being performed by Conrail, the Superior Court correctly determined that Pacific had an obligation to defend Conrail. We therefore affirm the Superior Court's grant of summary judgment for Conrail on this issue.[64]

---

a suit brought by a third party depend upon a determination of whether the third party's complaint triggers coverage.' ") (quoting *Mut. Benefit Ins. Co. v. Haver*, 555 Pa. 534, 725 A.2d 743, 745 (1999)).

**57.** *Roman Mosaic & Tile Co. v. Aetna Cas. & Sur. Co.*, 704 A.2d 665, 669 (Pa.Super.Ct.1997) (citing *Cadwallader v. New Amsterdam Cas. Co.*, 396 Pa. 582, 152 A.2d 484, 489 (1959)).

**58.** *Kvaerner Metals Div. of Kvaerner U.S., Inc.*, 908 A.2d at 896. *See also Erie Ins. Exch.*, 533 A.2d at 1368 ("If the complaint filed against the insured avers facts which would support a recovery that is covered by the policy, it is the duty of the insurer to defend until such time as the claim is confined to a recovery that the policy does not cover.").

**59.** *Roman Mosaic & Tile Co.*, 704 A.2d at 669.

**60.** *Flowers* Am. Compl. ¶ 20(b), *Fydenkevez* Am. Compl. ¶ 22(b).

**61.** *Consol. Rail Corp. v. Liberty Mut. Ins. Co.*, No. 97C–10–011, at 21 (Del.Super. Apr. 30, 2004) (quoting Pacific's Opening Brief in Support of its Motion Seeking a Declaration, at 11).

**62.** *Id.* at 22.

**63.** *Id.* The Superior Court used as an example the use of a flagman: "had flagmen been present at the job site or proper warning signals been installed, notice sufficient to have avoided the collisions in question may have been provided." *Id.*

**64.** *Consol. Rail Corp. v. Liberty Mut. Ins. Co.*, No. 97C–10–011, at 15–23 (Del.Super. Apr. 30, 2004); *Consol. Rail Corp. v. Liberty Mut. Ins. Co.*, No. 97C–10–001, at 3–6, 2005 WL 697943, at *1–2 (Del.Super. March 16, 2005) (affirming its April 30 holding with regard to the coverage under the Pacific Force Account Police).

### III. Conclusion

The judgment of the Superior Court as to Pacific's duty to defend is **AFFIRMED**. The judgment as to Liberty's duty to defend is **REVERSED** and this matter is **REMANDED** for further proceedings consistent with this Opinion.[65]

---

**65.** Because we conclude that both Liberty and Pacific have an obligation to reimburse Conrail for its defense costs, Pacific's remaining motion regarding the "other insurance" provisions is not moot. The Superior Court did not reach the merits of this argument in its April 30 opinion, and we will not address it here at first instance. *See supra* note 23.