# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| THE OPTIONS CLEARING CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>U.S. SPECIALTY INSURANCE COMPANY, INDIAN HARBOR INSURANCE COMPANY, and EVANSTON INSURANCE COMPANY,<br><br>Defendants. | )<br>)<br>)<br>) C.A. No. N20C-11-001 AML CCLD<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Submitted: September 7, 2021
Decided: November 30, 2021

## <u>MEMORANDUM OPINION</u>

**Upon Plaintiff's Motion for Partial Summary Judgment: GRANTED**

Miranda N. Gilbert, Esquire, Kenneth J. Nachbar, Esquire and John P. DiTomo, Esquire of MORRIS NICHOLS ARSHT & TUNNELL LLP, Wilmington, Delaware and Robin L. Cohen, Esquire, Adam S. Ziffer, Esquire and Michelle R. Migdon of COHEN ZIFFER FRENCHMAN & MCKENNA, New York, New York, Attorneys for Plaintiff The Options Clearing Corporation.

Robert J. Katzenstein, Esquire of SMITH, KATZENSTEIN & JENKINS LLP Wilmington, Delaware, and Leslie S. Ahari, Esquire and Emily A. Golding, Esquire of CLYDE & CO US LLP, Washington, D.C., Attorneys for Defendant U.S. Specialty Insurance Company.

Robert J. Katzenstein, Esquire of SMITH, KATZENSTEIN & JENKINS LLP Wilmington, Delaware, and Kimberly M. Melvin, Esquire and Elizabeth Jewell, Esquire of WILEY REIN LLP, Washington, D.C., Attorneys for Defendant Indian Harbor Insurance Company.

**LEGROW, J.**

The plaintiff, a clearing agency subject to federal oversight and regulation, seeks insurance coverage for defense costs the plaintiff incurred in connection with two enforcement actions pursued by federal regulators. The defendant insurers contend coverage is barred by policy provisions that exclude coverage for claims arising out of, based upon, or attributable to previous investigations into the plaintiff's compliance with various federal regulations.

The insurers seek to establish that the later actions are a continuation of compliance errors identified and investigated years earlier and therefore are barred by coverage exclusions for related claims. Although the insurers identify some general similarities between the earlier investigations and the later enforcement actions, the nature of the plaintiff's business makes it likely that those similarities would exist in any regulatory action directed toward the plaintiff. Significantly, the enforcement actions for which the plaintiffs seek coverage relate to regulations adopted after the previous investigation and - by extension - conduct allegedly occurring after that date. Under the exclusions' plain language, the enforcement actions are not related to the earlier investigation because there is no meaningful linkage between them. The insurers' contention that they should be permitted discovery into all aspects of the enforcement actions before the Court may determine relatedness fails under Delaware law. Accordingly, the plaintiff is entitled to partial

summary judgment as to coverage exclusions based on relatedness. My reasoning follows.

**FACTUAL & PROCEDURAL HISTORY**

**A. The Parties**

Unless otherwise noted, the following facts are not disputed. Plaintiff The Options Clearing Corporation ("OCC") is a registered United States clearing agency and derivatives clearing organization.[1] In March 2015, OCC first purchased Directors, Officers, and Organization ("D&O") Liability insurance from Defendants U.S. Specialty Insurance Company ("U.S. Specialty") and Indian Harbor Insurance Company ("Indian Harbor") (collectively, the "Insurers").[2] OCC renewed its policy (the "Primary Policy") with U.S. Specialty for the policy period March 15, 2017 to March 15, 2018.[3] That Primary Policy provides $5 million in coverage over a $250,000 retention.[4] Indian Harbor issued OCC the first excess policy with $5 million in coverage in excess of $5 million (the "Excess Policy"). The Excess Policy "follows form" to the Primary Policy, meaning it incorporates and adopts the Primary Policy's terms, conditions, definitions, and, importantly for this case, exclusions.[5]

---

[1] Plaintiff's Mot. for Partial Summ. J., (hereinafter "Plf.'s Mot.") at 1.
[2] Def.'s Mot. in Opp. of Plaintiff's Mot. for Partial Summ. J. (hereinafter "Def.'s Mot."). at 6.
[3] Plf.'s Mot. at 5.
[4] *Id*.
[5] *Id*.

## B. The Polices

The Primary Policy and Excess Policy (collectively, the "Policies") provide OCC coverage for "**Loss** arising from **Claims** first made against [OCC] during the **Policy Period** . . . for **Wrongful Acts**."[6]  A **"Claim"** includes "any oral or written demand, including any demand for non-monetary relief" and "any administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document."[7]  "A **Wrongful Act**" means "any actual or alleged act, error, misstatement, misleading statement, omission or breach of duty . . . by OCC.[8]  "**Loss**" includes "**Defense Costs** and any damages, settlements, judgments . . . that an Insured is legally obligated to pay as a result of any **Claim** . . ."[9]  And "**Defense Costs**" are the "reasonable legal fees, costs and expenses consented to by" OCC "resulting from the investigation, adjustment, defense or appeal of a **Claim** against an **Insured**.[10]  The Policies provide coverage for all OCC's Defense Costs, even if a Claim only is partially covered.[11]

---

[6] *Id.*; *see also* Ex. 1, Insuring Agreement B.
[7] *Id.* at 6; *see also* Ex. 1, Definitions (B)(1), (4).
[8] *Id.*; *see also* Ex. 1, Definitions (U).
[9] *Id.*; *see also* Ex. 1, Definitions (J).
[10] *Id.*; *see also* Ex. 1, Definitions(C).
[11] *Id.*

## 1. The Event Exclusion Provision

The Policies contain exclusions (the "Exclusions") that Defendants list among their affirmative defenses but that OCC contends are not applicable to this case.[12] The Exclusions were negotiated between OCC's broker and U.S. Specialty's underwriter.[13] The "Event Exclusion" relieves the Insurers from any obligation to cover any **Claim** related to certain previous events involving a Security and Exchange Commission ("SEC") investigation into OCC's compliance with particular industry standards and regulations (the "Event Exclusion"). Specifically,

> The Insurers will not be liable to make any payment of **Loss** in connection with a **Claim** arising out of, based upon or attributable to:
> (a) any **Event(s)**;
> (b) the prosecution, adjudication, settlement, disposition, resolution or defense of any **Event(s)** and/or any **Claim(s)** arising from any **Event(s)**;
> (c) any **Wrongful Act**, underlying fact or circumstance in any way relating to any **Event(s)**; or
> (d) any **Interrelated Wrongful Act**, regardless of whether or not such **Claim** involves the same or different **Insureds** or parties, the same or different legal causes of action or the same or different claimants, or is brought in the same or different venue or resolved in the same or different forum.[14]

> For the purposes of this provision, "Event" means:

> any of the following Claim(s), notice(s), event(s), investigation(s), litigation(s) and/or action(s):

---

[12] *Id*. at 7.
[13] Def.'s Mot. at 7.
[14] Plf.'s Mot. at 7. *See* Ex. 1, Specific Event(s) Exclusion- Absolute.

4

detailed in the June 7, 2012, September 18, 2013 and September 18, 2014 letters[15] from the SEC and [OCC]'s subsequent response letters dated August 6, 2012, November 1, 2013 and November 3, 2014.[16]

## 2. Prior Notice Exclusion

In addition to the Event Exclusion, the Policies' Prior Notice Exclusion bars coverage for **Loss** in connection with a **Claim**:

> arising out of, based upon or attributable to facts or circumstances alleged, or to the same or related **Wrongful Acts** alleged or contained, in any claim which has been reported, or with respect to which any notice has been given, under any policy of which this Policy is a renewal or replacement or which it may succeed in time[.][17]

## C. 2012-2014 OCIE Letters

OCC is a registered United States clearing agency and derivatives clearing organization, acting as a central counterparty and providing clearing and settlement services to eighteen exchanges.[18] OCC is the sole registered clearing agency for exchange listed options contracts in the United States and has been designated as a "systemically important financial market utility" (a "SIFMU") under Title VII of the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank

---

[15] A detailed explanation of these letters follows. The letters will be referred to collectively as the "2012-2014 OCIE Letters" because they derive from the Security and Exchange Commission's Office of Compliance Inspections and Examinations during that range of years.

[16] Plf.'s Mot. at 7; *see* Ex. 1, Specific Event(s) Exclusion- Absolute (1)(A). The Insurers contend that after OCC sought coverage from U.S. Specialty for the SEC Investigation, U.S. Specialty learned at least 7 additional letters and 6 formal Inspection Reports had been sent by the SEC between 2012 and March 2015, which had not been disclosed. Def.'s Mot. at 6, n. 4.

[17] *Id*. Definitions (B)(1)(H).

[18] *Id.* at 4.

Act").[19] In that role, OCC falls within the oversight responsibility of the SEC's Office of Compliance Inspections and Examinations ("OCIE"). The OCIE conducts the SEC's National Exam Program, which examines financial market participants, like OCC, on a regular basis, facilitating compliance and cooperation between its examination staff and the registered entities.[20] The OCIE's mission is to protect investors, ensure market integrity, and support reasonable capital formation through risk-focused strategies that improve compliance, prevent fraud, monitor risk, and inform policy.[21]

In 2012, the OCIE identified deficiencies at OCC and informed them that an investigation was underway.[22] Between June 2012 and November 2017, the SEC sent at least 25 letters and 9 inspection reports to OCC concerning noncompliance and potential violations of the Securities and Exchange Act of 1934.[23] Three specific letters and responses from the OCIE, the 2012-2014 OCIE Letters, are the subject of the Event Exclusion provision in the Policies.[24]

Each of the 2012-2014 OCIE Letters addressed different concerns. The 2012 Letter identified system control failures in OCC's Escrow Receipt Depository

---

[19] *Id*. at 4-5; Ex. 11 at 2. SIFMUs are subject to a host of new regulations and enhanced and evolving expectations by regulators and are highly scrutinized. *See* Plf.'s Mot. Ex. 9.
[20] Def.'s Mot. at 17.
[21] *Division of Examinations*, U.S. SECURITIES AND EXCHANGE COMMISSION, https://www.sec.gov/exams (last visited Nov. 9, 2021, 3:54 PM).
[22] Def.'s Mot. at 2.
[23] *Id.* at 3.
[24] Plf.'s Mot. at 2.

program, reduced effectiveness of the internal audit function, weaknesses within OCC's risk management framework, and insufficient written, formal policies and procedures throughout the organization.[25] The 2013 Letter involved a number of repeat findings, causing OCIE to raise a serious concern about OCC's overall commitment to establishing a culture of regulatory compliance and its ability to timely and adequately address the Staff's findings.[26] The 2013 Letter also found a pattern of systemic weaknesses in OCC's risk management and operations in the areas of Quantitative Risk Management, Governance, Liquidity, Policies and Procedures and Documentation.[27] Lastly, the 2014 Letter found OCC did not sufficiently identify and mitigate operational risk, as specified under standards established by Exchange Act Rule 17Ad-22(d)(4), which require clearing agencies to identify and minimize operational risk through the development of appropriate systems, controls, and procedures.[28] Collectively, the 2012-2014 OCIE Letters noted several points where OCC's documentation and practices were not in compliance with securities laws and regulations or otherwise were insufficient.[29]

---

[25] *Id.*; Ex. 14.
[26] *Id.*; Ex. 15.
[27] *Id.*
[28] *Id.*; Ex. 16.
[29] *See* Compl. ¶ 31.

Christine Montelbano ("Montelbano") underwrote on U.S. Specialty's behalf the primary D&O liability insurance policies issued to OCC from 2015 to 2020.[30] During the underwriting process, U.S. Specialty examined the 2012-2014 OCIE Letters and became aware the SEC was scrutinizing OCC's operations, internal controls and risk management for noncompliance with securities laws and regulations.[31] Based on her assessment of those Letters, Montelbano agreed to issue a primary D&O policy to OCC, but drafted the Events Exclusion to bar coverage for OCC's "ongoing noncompliance and violations of the securities laws reflected in the SEC's findings."[32] When the Events Exclusion was prepared, the only documents in Montelbano's possession relating to the SEC's scrutiny of OCC were the 2012-2014 OCIE Letters.[33]

### D. The SEC Enforcement Actions

On June 14, 2017, the SEC's Division of Enforcement informed OCC of "an ongoing investigation" (the "2017 Letter").[34] The 2017 Letter required OCC to preserve and retain evidence relating to its compliance with specific SEC statutes and regulations "until further notice," and warned that OCC's failure to do so "could

---

[30] Declaration of Christine Montelbano (hereinafter "Monetelbano Decl.") ¶ 2. The policy relevant to this action is Policy No. 24-MGU-17-A40094, issued for the period of March 15, 2017, to March 15, 2018. *Id.* at ¶ 4.

[31] Montelbano Decl. ¶ 7.

[32] *Id.* ¶ 12.

[33] *Id.* ¶ 16.

[34] Plf.'s Mot. at 9; Ex. 6.

8

give rise to civil and criminal liability."[35]   OCC was instructed to preserve documents dating back to January 1, 2013.[36]  On February 27, 2018, the Division of Enforcement notified OCC of its intention to recommend the SEC bring an enforcement action alleging violations of specified regulatory provisions.[37]

### 1.  The Draft SEC Order Instituting Proceedings ("OIPs")

On March 12, 2018, OCC executed a prejudgment waiver, filed a Position Statement, and submitted compliance plans as requested by the SEC.[38]  The waiver allowed SEC staff to discuss the matter with the SEC Commissioners.[39]  On April 26, 2018, OCC sent the SEC a Statement of Position.[40]  On August 6, 2018, the SEC provided a draft Order Instituting Proceedings ("Draft SEC OIP") to OCC, which included a list of proposed charges against OCC.[41]   Unless OCC entered into a settlement, the SEC indicated it would file an administrative proceeding.[42]

### 2.  SEC's Final OIP

After negotiations, on September 4, 2019, the SEC issued a final OIP (the "SEC OIP") which included allegations that OCC violated certain statutes and

---

[35] *Id.*
[36] Def.'s Mot. at 3.
[37] Plf.'s Mot. at 9; Ex. 24 at 2.
[38] *Id*; Exs. 7-9.
[39] *Id*. at 9.
[40] Def.'s Mot. at 3.
[41] Plf.'s Mot. at 9-10; Ex. 10; Ex. 24 at 4.
[42] *Id*. at 10.

regulations.[43] OCC entered into a settlement agreement with the SEC to avoid an administrative proceeding, agreeing to pay $15 million in penalties and accept a mandatory injunction to force improved compliance, including the appointment of an independent auditor.[44] The alleged violations involved (1) the Covered Clearing Agency Standards (the "2016 CCAs"), effective December 12, 2016 (requiring OCC's compliance by April 11, 2017), (2) Regulation Systems, Compliance, and Integrity ("Reg. SCI"), effective February 3, 2015 (requiring OCC's compliance by November 3, 2015), and (3) Section 19(b)(1) of the Exchange Act .[45]

### a. The 2016 CCAs

Seven of the twelve violations identified in the SEC OIP involved a new paragraph (e) of Exchange Act Rule 17Ad-22; this paragraph was added when the SEC adopted the 2016 CCAs on September 28, 2016, and OCC's compliance deadline was April 11, 2017.[46] The SEC OIP asserted OCC violated paragraph (e) by failing to implement certain policies and procedures reasonably designed to provide a transparent legal framework, maintain risk management, and establish a methodology to account for risks and attributes of products cleared by OCC.[47]

---

[43] *Id.*
[44] *Id.* at 10-11.
[45] *Id*. at 10.
[46] *Id*. at 11.
[47] *Id*. at 11-12; for a more detailed description, *see* Ex. 11 at ¶¶ 17-35, 50-56.

### b. Allegations involving Reg. SCI 19(b)

The SEC OIP also included alleged violations of Reg. SCI, which required OCC to create policies and procedures to ensure the security of its computers, network, and electronic systems that support clearance and settlement of financial transactions.[48] After the November 3, 2015 compliance date passed, the SEC OIP found OCC failed to establish written policies and procedures reasonably designed to identify and test vendor-issued patches and secure certain data.[49]

### c. Rule-Filing Obligation Violations

The SEC OIP also identified one violation of Section 19(b)(1) of the Exchange Act, requiring OCC to file with the SEC policies and practices that meet the definition of a proposed rule change.[50] In contrast to the 2016 CCAs and Reg. SCI, these rule-filing obligations were in effect from 2012-2014, but were not the subject of the 2012-2014 OCIE Letters.[51] These alleged violations arose because of OCC's 2015 notification to the SEC that OCC did not plan to seek approval of certain policies under which it had been operating, but instead would file changes to those policies going forward.[52] The SEC rejected that position.[53] Further, the SEC OIP

---

[48] *Id*. at 12; Ex. 11 at ¶¶ 43-45.
[49] *Id*. at 12-13; for more detailed description, *see* Ex.11 at ¶¶ 47, 58-59.
[50] *Id*. at 13.
[51] *Id*.
[52] *Id.*; *see also* Ex 9 at 19-23; Ex. 24 at 15.
[53] *Id*.

listed various policies OCC implemented before obtaining the SEC's approval, including six policies OCC revised in May 2017.[54]

### d. The February 2018 Market Event

Before issuing the SEC OIP, the SEC also questioned OCC about its response to a one-day market volatility anomaly that occurred on February 5, 2018.[55] After the event, OCC recalculated margins due by exercising its Rule 609A waiver authority; this provided OCC with a short-term remedy as a response to the one-day market volatility anomaly.[56] In the Draft SEC OIP, the SEC alleged OCC failed to enforce its margin level policies "from February 6, 2018 to February 15, 2018."[57] This claim, however, eventually was removed from the final SEC OIP.[58]

### E. The Commodity Futures Trading Commission ("CFTC") Enforcement Action

On June 1, 2018, the Division of Enforcement of the Commodity Futures Trading Commission (the "CFTC") informed OCC that the CFTC was conducting an investigation concerning compliance with CFTC regulations.[59] The CFTC issued its own draft and final OIPs (respectively, the "CFTC Draft OIP" and the "CFTC OIP") on August 6, 2018, and September 4, 2019, asserting OCC violated Core Principles

---

[54] *Id*. at 14.
[55] *Id*.
[56] *Id*.
[57] *Id*.
[58] *Id*. at 15.
[59] *Id*.

(B, D and I) under Section 5(b) of the Commodity Exchange Act and related Part 39 regulations.[60] The factual allegations included in the CFTC OIP track those underlying the SEC OIP.[61] A similar claim concerning the February market volatility event was included in the CFTC Draft OIP, but OCC defended against this allegation; like the SEC Enforcement Action, this allegation was removed from the final CFTC OIP.[62] OCC entered into a settlement agreement with the CFTC, paying $5 million in penalties and agreeing to injunctive relief.[63] OCC neither admitted nor denied the CFTC's allegations in connection with the settlement.[64]

## F. Contact with the Insurers

On November 10, 2017, OCC provided notice to the Insurers of the SEC Enforcement Action under Policies issued for the 2017-2018 period, and OCC gave the Insurers notice of the CFTC Enforcement Action on October 5, 2018 under policies issued for the 2018-2019 period.[65] In October 2018, OCC also forwarded its April 2018 Statement of Position and the Draft SEC OIP along with additional materials to show, in its view, an actual Claim had been made.[66]

---

[60] *Id*. at 15-16.
[61] *Id*. at 16. Specifically, the CFTC OIP, like the SEC OIP, alleged OCC failed to implement policies and procedures reasonably designed to: (1) produce margin levels commensurate with the risk and attributes of each relevant product, (2) effectively monitor its credit exposure and liquidity risk, and (3) protect the security of certain information systems. Ex. 13 at 2.
[62] *Id*. at 16.
[63] *Id*. at 17.
[64] *Id*.
[65] *Id*. at 21.
[66] Def.'s Mot. at 8.

On December 7, 2018, U.S. Specialty denied coverage for the SEC Enforcement Action based on the Events Exclusion, claiming the alleged violations in the SEC Draft OIP arose out of the events detailed in the 2012-2014 OCIE Letters, which were "continuing and unresolved."[67]  U.S. Specialty also accepted notice of the CFTC Enforcement Action on that same day; it did not deny coverage of that action under the Events Exclusion or on any other basis, but reserved its right to deem the CFTC Enforcement Action related to the SEC Enforcement Action (the "Enforcement Actions").[68]  In response, OCC's counsel sent U.S. Specialty a letter detailing the differences between the SEC Enforcement Action and the 2012-2014 OCIE Letters and asking U.S. Specialty to reconsider its coverage position.[69]

On December 20, 2019, U.S. Specialty maintained its position that the SEC Enforcement Action was barred by the Events Exclusion after receiving the Final SEC OIP; at this time, U.S. Specialty also raised the Prior Notice Exclusion as an independent reason to deny coverage.[70]  U.S. Specialty did concede that the Final OIP constituted a Claim against OCC.[71]  But U.S. Specialty reiterated denial of coverage on July 28, 2020.[72]

---

[67] Plf.'s Mot. at 21; Ex. 22 at 6.
[68] *Id.* at 22; Ex. 23.
[69] *Id.* at 21.
[70] *Id.* at 22.
[71] *Id.*
[72] *Id.*

OCC filed its action against the Insurers on November 10, 2020, alleging breach of the 2017-2018 Policies and seeking coverage for the defense costs OCC incurred in connection with the investigation.[73]  On April 28, 2021, OCC filed this motion for partial summary judgment on relatedness.[74]  At the time OCC filed its summary judgment motion, Defendants had discovery requests outstanding.[75]  On April 30, 2021, OCC served responses and objections to U.S. Specialty's Requests for Production, but OCC did not produce any documents in response to those Requests.[76]

## G. Party Contentions

OCC contends the Court should enter summary judgement in its favor with respect to the Events Exclusion and the Prior Notice Exclusion.  OCC argues the Exclusions are not blanket SEC or regulatory exclusions, but instead exclude coverage for particular bargained-for events unrelated to the Enforcement Actions at issue here.[77]  OCC asserts that under Delaware law, the Enforcement Actions must be "fundamentally identical" to the 2012-2014 OCIE Letters to bar coverage based

---

[73] Def.'s Mot. at 9; Compl. ¶¶ 5, 46-50.
[74] *See* Plf.'s Mot.
[75] U.S. Specialty sent Requests for Production of Documents to OCC on March 8, 2021.
[76] Emily A. Golding Affidavit (hereinafter "Golding Aff"). at ¶ 9.
[77] Plf.'s Mot. at 4.

on relatedness.[78] And OCC stresses that the Enforcement Actions are not sufficiently related to the 2012-2014 OCIE Letters to preclude coverage.[79]

OCC emphasizes several differences between the OCIE Letters and the Enforcement Actions. OCC contends those differences preclude this Court from finding the actions "fundamentally identical," arguing the OCIE Letters and the Enforcement Actions involve (1) different regulatory bodies; (2) different time periods; (3) different alleged wrongful conduct under different enforcement schemes; and (4) different requested relief.[80] The Polices provide that, even if a Claim involves both covered and uncovered matters, 100% of OCC's Defense Costs will be allocated to the covered matters.[81] So, OCC contends all the Defense Costs it incurred in defending the Enforcement Actions are covered because at least a portion of the Enforcement Actions are unrelated to the 2012-2014 OCIE Letters and therefore covered.[82] Lastly, OCC asserts the 2012-2014 OCIE Letters were related to rules and regulations under the SEC's authority, while the CFTC brought

---

[78] *Id*. at 3.

[79] *Id*.

[80] *Id*. Specifically, OCC argues that (1) the OCIE, which coordinates routine yearly compliance reviews vs. the enforcement divisions of the SEC and CTFC; (2) the 2012-2014 OCIE Letters cover conduct prior to 2014, while the Enforcement Actions cover activity from 2015-2018; (3) the 2012-2014 OCIE Letters focused on areas for compliance improvements, while the Enforcement Actions alleged violations of various statutes and regulations that had not even been adopted at the time of the earlier examinations; and (4) OCC designed remediation plans instead of the SEC and CFTC mandated monetary penalties and injunctive relief in the Enforcement Actions.

[81] *Id*. at 2, Ex. 1.

[82] Plf.'s Mot. at 2.

an independent Enforcement Action against OCC for alleged violations of the Commodity Exchange Act and related regulations.[83]

The Insurers contend OCC's summary judgment motion is premature.[84] The Insurers argue they should be permitted to take discovery under Superior Court Civil Rule 56(f) concerning the exact circumstances and events related to the OIPs issued by the SEC and the CFTC, as well as the scope of the Enforcement Actions.[85] The Insurers also assert material disputes of fact concerning the Exclusions negate the application of the "fundamentally identical" standard.[86] The Insurers believe the Event Exclusion is broad enough to exclude coverage for any Claim arising out of, based upon or attributable to any Wrongful Act or any underlying fact or circumstance in any way relating to the 2012-2014 SEC Letters[87]

The Insurers also allege that the phrase "Covered and uncovered" matters used in the Allocation Provision is limited to the circumstances where an indisputably covered Claim includes some uncovered aspect, which is inapplicable in this case.[88] A covered Claim would allow OCC to seek covered damages, wages,

---

[83] *Id*. at 4.
[84] Def.'s Mot. at 1.
[85] *Id*.
[86] *Id*. at 2.
[87] *Id*. at 7; Ex. 1.
[88] *Id*. at 34.

fines, taxes or penalties, and the Policies would allow 100% coverage for defense costs, notwithstanding the uncovered matters included in the Claim.[89]

## ANALYSIS

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits" show "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[90] The movant bears the initial burden of demonstrating its motion is supported by undisputed material facts.[91] If that burden is met, the non-movant must demonstrate that there is a "genuine issue for trial."[92] To determine whether material facts are in dispute, the Court construes the record in the light most favorable to the non-movant.[93]

> **A. The Insurers have not carried their burden of demonstrating that the Policies' Exclusions apply because the 2012-2014 OCIE Letters are not related to the Enforcement Actions.**

Delaware law governs the Policies.[94] OCC, as the insured, has the burden of "proving that a claim is covered by an insurance policy," and if satisfied, "the burden

---

[89] *Id.*

[90] Del. Super. Ct. Civ. R. 56(c).

[91] *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1979).

[92] Del. Super. Ct. Civ. R. 56(e); *see also Brzoska v. Olson*, 668 A.2d 1355, 1364 (Del. 1995) ("If the facts permit reasonable persons to draw but one inference, the question is ripe for summary judgment.").

[93] *Judah v. Del. Tr. Co.*, 378 A.2d 624, 632 (Del. 1977).

[94] Compl. ¶ 15-17. The Insurers did not argue that any other state's law governs the Policies. Further, the Delaware Supreme Court has concluded that Delaware law generally applies to D&O coverage for Delaware corporations. *See RSU Indem. Co. v. Murdock*, 248 A.3d 887, 900-01 (Del.

18

shifts to the [I]nsurer[s] to prove that the event is excluded under the policy."[95] The

Insurers' Exclusions only will bar coverage if the Enforcement Actions are related

to the 2012-2014 OCIE Letters under the Policies' definition of relatedness.

Under Delaware law, the principles of insurance contract interpretation are

well-established and grounded in the parties' intent.[96]   Trial courts have been

instructed to analyze contracts using a "plain language framework that is based on

general interpretive principles."[97] OCC attempts to persuade this Court that it should

determine relatedness between the Enforcement Actions and the 2012-2014 OCIE

Letters by applying a "fundamentally identical" standard.  But that standard is not

grounded in the Policies' language, and this Court therefore declines to apply it.[98]  If

2021) ("[I]n the vast majority of cases, Delaware law governs the duties of the directions and officers of Delaware corporation to the corporation, its stockholders and its investors.  As such corporations must assess their need for D&O coverage with reference to Delaware law.") (internal citations omitted).

[95] *See Virtual Bus. Enterprises, LLC v. Maryland Cas. Co.*, 2010 WL 1427409, at *4 (Del. Super. Ct. Apr. 9, 2010).

[96] *Sycamore Partners Mgmt., L.P. v. Endurance Am. Ins. Co.*, 2021 WL 4130631, at *10 (Del. Super. Ct. Sept. 10, 2021.)

[97] *Id.* at *11 (Del. Super. Ct. Sept. 10, 2021.)

[98] This Court recently addressed the "fundamentally identical" standard in *Sycamore Partners Mgmt., L.P. v. Endurance Am. Ins. Co.*  There, the Court explained that a number of recent decisions from the Delaware Superior Court have applied a "fundamentally identical" standard to policy exclusions based on the relatedness of claims.  But the Court went on to explain that neither the Delaware Supreme Court nor any other jurisdiction has adopted "fundamental identity" as the standard for all relatedness inquiries. Specifically, this Court explained: "To apply indiscriminately that type of gloss to otherwise unambiguous policy language arguably could contravene Delaware law requiring this Court to interpret insurance policies according to their plain language and to avoid grafting public policy limitations into contracts in the absence of a policy pronouncement by the General Assembly."  *Sycamore Partners Mgmt., L.P.*, 2021 WL 4130631 at *11 (*citing In re Solera Ins. Coverage Appeals*, 240 A.3d 1121, 1131(Del. 2019), *In re Verizon Ins. Coverage Appeals*, 222 A.3d 566, 573-75 (Del. 2019)); *Sycamore Partners Mgmt., L.P. v. Endurance Am. Ins. Co.,* 2021 WL 761639, at *11 (Del. Super. Ct. Feb. 26, 2021) ("*Sycamore I"*).

contract language is clear and unambiguous, the parties' intent is established by giving the language its ordinary and usual meaning.[99]  A contract will not be found ambiguous simply because parties do not agree on its construction.[100]  Ambiguity exists only when the contract's controversial provisions reasonably are susceptible of different interpretations or have two or more different meanings.[101]

This Court finds the Policies' relevant terms clear and unambiguous. The Event Exclusion bars coverage for Claims "arising out of," "based upon," or "attributable" to the OCIE Letters or any Wrongful Act, which "in any way relat[es] to" the OCIE Letters or an Interrelated Wrongful Act.[102] An Interrelated Wrongful Act is "any fact or circumstance alleged" in the OCIE Letters or any Wrongful Act "which is the same as, similar or related to, or a repetition of any Wrongful Act" alleged or asserted in the OCIE Letters.[103]  Well-settled Delaware law instructs this Court to look to dictionaries for assistance in determining the plain meaning of undefined contract terms.[104] The Delaware Supreme Court has undertaken this

---

[99] *RSU Indem. Co. v. Murdoc*k, 248 A.3d 887, 905-06 (Del. 2021).
[100] *Id.*
[101] *Id.*
[102] Plf.'s Mot., Ex. 1, Specific Event(s) Exclusion- Absolute.
[103] Def.'s Mot. at 34; Ex. 1
[104] *Tetragon Financial Group Limited v. Ripple Labs Inc.*, 2021 WL 1053835, at *4 (Del. Ch. Mar. 19, 2021) (*citing Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006)."...[D]ictionaries are the customary reference source that a reasonable person in the position of a party to a contract would use to ascertain the ordinary meaning of words not defined in the contract.") *Id.*

process and defined "arising out of" as having "some meaningful linkage."[105] With no other textual intent provided by the parties, phrases like "based on" and "attributed to" also most logically mean "originating from" or "sharing some meaningful linkage."[106] The Court therefore reads the Event Exclusion to mean that the Insurers will not be liable to pay any Loss in connection with a Claim originating from or with "some meaningful linkage" to:

(a) any Event(s);
(b) the prosecution, adjudication, settlement, disposition, resolution or defense of any Event(s) and/or Claim(s) arising from any Event(s);
(c) any Wrongful Act, underlying fact or circumstance in any way relating to any Event(s); or
(d) any Interrelated Wrongful Act, regardless of whether or not such Claim involves the same or different Insureds or parties, the same or different legal causes of action or the same or different claimants, or is brought in the same or different venue or resolve in the same or different forum."[107]

When considering the plain language, the Event Exclusion bars coverage of a Claim with a "meaningful link" to the allegations in the 2012-2014 OCIE Letters. Additionally, the Event Exclusion bars coverage of the prosecution, adjudication, settlement, disposition, resolution or defense of a Claim with a "meaningful link" to the 2012-2014 OCIE Letters. Third, the Event Exclusion bars coverage for a Claim that has a "meaningful link" to any Wrongful Act that relates to the 2012-2014 OCIE

---

[105] *Pac. Ins. Co. v. Liberty Mut. Ins. Co.*, 956 A.2d 1246, 1257 (Del. 2008); *Eon Labs Mfg., Inc., v. Reliance Ins. Co.*, 756 A.2d 889, 894 (Del. 2000).
[106] *See Sycamore Partners Mgmt., L.P.*, 2021 WL 4130631, at *12. Naturally, this assertion should also qualify for phrases such as "based upon" or "attributable to."
[107] Plf.'s Mot., Ex. 1, Specific Event(s) Exclusion- Absolute.

21

Letters. Finally, the Event Exclusion bars coverage for a Claim with a "meaningful link" to any Interrelated Wrongful Act. Accordingly, to invoke this exclusion, the Insurers must establish a "meaningful link" between the Enforcement Actions and the 2012-2014 OCIE Letters or the wrongful conduct alleged in those letters.

Similarly, the Prior Notice Exclusion bars coverage for Loss in connection with a Claim "arising out of, based upon or attributable to facts or circumstances alleged, or to the same or related Wrongful Acts alleged or contained" in any Claim that already has been reported to the Insurers.[108] Here too a "meaningful link" must exist between the Enforcement Actions and the 2012-2014 Letters for the Prior Notice Exclusion to apply.

This Court holds that no such meaningful link exists between the Enforcement Actions and the 2012-2014 OCIE Letters or the wrongful acts alleged therein. In determining whether a "meaningful link" exists, this Court has held that it is not enough for two claims to mention some of the same facts.[109] And the Delaware Supreme Court has instructed lower courts to implement "meaningful linkage" in a coverage context broadly, where possible, to find coverage.[110] As OCC correctly asserted, the nature of its business is such that there is bound to be some surface-

---

[108] *Id*. at 7. Definitions (B)(1)(H).
[109] *See, e.g., Sycamore Partners Mgmt., L.P.*, 2021 WL 4130631, at *14.
[110] *Sycamore Partners Mgmt., L.P. v. Endurance Am. Ins. Co.*, 2021 WL 4130631, at *14 (Del. Super. Ct. Sept. 10, 2021) (citing *Pac. Ins. Co. v. Liberty Mut. Ins. Co.*, 956 A.2d 1246, 1256-57 & n.42 (Del. 2008)).

level overlap between earlier enforcement actions and those for which OCC presently seeks coverage.[111] But several key differences refute the Insurers' argument that a "meaningful link" exists between the Exclusions and the 2012-2014 OCIE Letters.

First, the type of investigation differs between the Enforcement Actions and the 2012-2014 OCIE Letters.[112] The Enforcement Actions are not concerned with routine annual compliance examinations, while the 2012-2014 OCIE Letters involve the SEC Office of Compliance Inspections and Examinations in its function of overseeing annual compliance.[113] Second, the investigation time periods differ; the SEC Enforcement Action occurred during 2017-2019, the CFTC Enforcement Action was between 2018-2019, and the 2012-2014 OCIE Letters were from 2009-2013.[114] Next, the regulations allegedly violated differ from the Enforcement Actions and the 2012-2014 OCIE Letters. The SEC Enforcement Action involved the 2016 CCAs, Reg. SCI, Rule-Filing Obligations in Section 19(b) and Rule 17Ad-22(b)(2) and (d)(1).[115] The CFTC Enforcement Action concerned Section 5b(c)(2)(B), (D), and (I) of the Commodity Exchange Act and Section 39 Regulations.[116] But overall, the 2012-2014 OCIE Letters only involved general

---

[111] D. I. 58 Tr. at 6.
[112] Plf.'s Mot., Comparison Chart [hereinafter "Chart"], at 1.
[113] *Id.*
[114] *Id.*
[115] *Id.*
[116] Plf.'s Mot. at 15-16.

compliance obligations.[117] Perhaps most significantly, the Enforcement Actions and the 2012-2014 OCIE Letters differ in the type of wrongful conduct that is alleged. The SEC Enforcement Action alleges OCC (1) failed to maintain policies for credit and liquidity stress testing and margin methodologies as demanded by the 2016 CCAs; (2) failed to maintain system infrastructure policies as demanded by Reg. SCI; (3) failed to file proposed rules with the SEC; and (4) engaged in wrongful conduct involving the 2018 volatility event.[118] The CFTC Enforcement Action reproduces the allegations contained in the SEC Enforcement Action. But the 2012-2014 OCIE Letters involve (1) deficiencies and weaknesses in OCC's escrow deposit program, (2) its handling of confidential information, and (3) board structure. Lastly, the Enforcement Actions differ from the 2012-2014 OCIE Letters based on the nature of relief sought. The Enforcement Actions sought punitive damages and injunctive relief. The 2012-2014 OCIE Letters sought compliance and remediation of OCC's deficiencies and weaknesses.

This interpretation and application of the Exclusions also avoids rendering coverage under the Policies illusory. As a policy matter, the Exclusions must be construed to safeguard OCC's reasonable expectation of insurance coverage. [119]

---

[117] Specifically, the 2012-2014 OCIE Letters made references to Exchange Act Rule 17Adj-22(b)(2); (b)(3); (b)(4); and (d)(1), (d)(3), (d)(4), (d)(8), (d)(11); Rule 17a-1; and Section 19(g)(1).
[118] Chart, at 1.
[119] *Sycamore Partners Mgmt., L.P.*, 2021 WL 4130631, at *11.

Insurance contracts should be interpreted as providing broad coverage to align with an insured's reasonable expectations, and it is the insurer's burden to establish that a claim specifically is excluded.[120] The Insurers successfully bargained for the inclusion of the 2012-2014 OCIE Letters as part of an exclusion within the Policies. The Insurers did not bargain for the inclusion of any Claim that has "any fact in common" with the 2012-2014 OCIE Letters or any Claim involving an SEC office. If this Court were to interpret the Policies that broadly, coverage would be elusive.

Having concluded the Exclusions do not apply, the Court need not address the other issues the parties raised in their briefs, namely (1) whether the Enforcement Actions involved a single Claim or multiple Claims, and (2) the effect of the 100% allocation provision.[121]

## B. The Insurers' Rule 56(f) request is denied.

A motion under Superior Court Civil Rule 56(f) is directed to this Court's broad discretion.[122] In certain circumstances, the Court may "refuse the application for [summary] judgment" or "may order a continuance" to permit an opposing party to gather discovery.[123] "[A] party opposing summary judgment may, pursuant to … Rule 56(f), request limited discovery if it cannot present facts essential to oppose the

---

[120] *Murdock*, 248 at 905-06.
[121] The Policies also include a Pre-Pending Litigation Exclusion. The Insurers did not address this in the Answering Brief, admitted so in oral argument, and therefore that argument is moot.
[122] *Brick v. Retrofit Source, LLC,* 2020 WL 4784824, at *3 (Del. Ch. Aug. 18, 2020).
[123] Del. Super. Ct. R. 56(f).

summary judgment motion."[124] The party seeking discovery bears the burden of demonstrating the discovery requested is both specific and relevant "in light of applicable law."[125] In support of their Rule 56(f) affidavit, the Insurers allege they were provided with very little documentation of the SEC Enforcement Action or the CFTC Enforcement Action during the pendency of those investigations.[126] The Insurers claim the information necessary to adequately respond to and oppose OCC's Motion exclusively is in OCC's possession.[127]

The Insurers first argue discovery is necessary to determine whether the Enforcement Actions constitute a single Claim or multiple Claims at issue.[128] But as indicated above, the Court does not need to address this question at this time. Based on this Court's ruling, the issue regarding the number of claims need not be resolved. This issue may be relevant to retention but does not preclude summary judgment on the relatedness question before the Court.

The Insurers also contend discovery is needed to respond to OCC's argument that the Prior Notice Exclusion does not exclude coverage for the Enforcement

---

[124] *Aveanna Healthcare, LLC v. Epic/Freedom, LLC*, 2021 WL 3235739, at *28 (Del. Super. Ct. July 29, 2021) (*citing Corkscrew Mining Ventures, Ltd. V. Preferred Real Est. Fund Invs., Inc*., 2011 WL 704470, at *3 (Del. Ch. Feb. 28, 2011)).
[125] *Aveanna Healthcare, LLC*, 2021 WL 3235739, at *28. (citing *Schillinger Genetics v. Benson Hill Seeds, Inc.*, 2021 WL 320723, at *16 (Del. Ch. Feb. 1. 2021)).
[126] Golding Aff. ¶ 13.
[127] *Id*.
[128] *Id*. ¶ 15.

Actions in this case.[129] The Insurers argue OCC filed this motion too quickly.[130] But this Court takes no issue with the timing of this motion. Next, the Insurers contend they are entitled to discover the communications between OCC and the SEC that resulted in the Final OIP to determine the "contours" of OCC's claim. But the Insurers have failed to cite to any authority for the proposition that this Court should look beyond the pleading documents and consider communications between parties in addition to formal documents as a means of determining relatedness.[131] This Court only considers the language of the Policies and the pleadings or similar formal documents to determine the scope of coverage for defense costs.[132] The Court does not find such discovery relevant to the summary judgment motion.

Lastly, the Insurers argue discovery is needed to aid in policy interpretation if the terms are deemed ambiguous by this Court.[133] But the Policies' terms are not ambiguous, and this argument therefore is moot.

**CONCLUSION**

For the foregoing reason, OCC's motion for partial summary judgment on relatedness is granted. The Insurers have failed to meet their burden of proving that

---

[129] *Id.* ¶ 13.

[130] D. I. 58 Trans. 36:10-13.

[131] *See id.* 42, 50:4-9.

[132] In determining coverage for defense costs, the Court looks to the allegations in the underlying complaint. *See IDT Corp. v. U.S. Specialty Ins. Co.*, 2019 WL 413692, at *10 (Del. Super. Ct. Jan. 31, 2019); *Johnston v. Tally Ho, Inc.*, 303 A.2d 677, 679 (Del. Super. Ct. 1973).

[133] Golding Aff. ¶ 19.

the Enforcement Actions are related to the 2012-2014 OCIE Letters. Likewise, the

Insurers have failed to present a sufficient basis to support their Rule 56(f) affidavit.